# WHIRLPOOL CORP. *v.* MARSHALL, SECRETARY OF LABOR

No. 78–1870. Argued January 9, 1980—Decided February 26, 1980

2

STEWART, J., delivered the opinion for a unanimous Court.

*Robert E. Mann* argued the cause for petitioner. With

him on the briefs were *Ronald J. Hein, Jr.,* and *Mark A. Lies II.*

*Solicitor General McCree* argued the cause for respondent. With him on the brief were *Deputy Solicitor General Geller, Edwin S. Kneedler, Benjamin W. Mintz,* and *Dennis K. Kade.**

MR. JUSTICE STEWART delivered the opinion of the Court.

The Occupational Safety and Health Act of 1970 (Act) [1] prohibits an employer from discharging or discriminating against any employee who exercises "any right afforded by" the Act.[2] The Secretary of Labor (Secretary) has promulgated a regulation providing that, among the rights that the Act so protects, is the right of an employee to choose not to perform his assigned task because of a reasonable appre-

---

*Robert T. Thompson, Stephen A. Bokat,* and *Stanley T. Kaleczyc* filed a brief for the Chamber of Commerce of the United States as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Warren Spannaus,* Attorney General, and *Steven M. Gunn* and *Sharon L'Herault,* Special Assistant Attorneys General, for the State of Minnesota; by *J. Albert Woll, Elliott Bredhoff, John Fillion, George H. Cohen, Robert M. Weinberg, Laurence Gold,* and *George Kaufmann* for the American Federation of Labor and Congress of Industrial Organizations et al.; and by *Michael Churchill* for the Philadelphia Area Project on Occupational Safety and Health.

*Jeffrey B. Schwartz* filed a brief for the American Public Health Association as *amicus curiae.*

[1] 84 Stat. 1590, as amended, 92 Stat. 183, 29 U. S. C. § 651 *et seq.* (1976 ed. and Supp. II).

[2] Section 11 (c)(1) of the Act, 84 Stat. 1603, 29 U. S. C. § 660 (c)(1), provides in full:

"No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any right afforded by this Act."

hension of death or serious injury coupled with a reasonable belief that no less drastic alternative is available.[3] The question presented in the case before us is whether this regulation is consistent with the Act.

---

[3] The regulation, 29 CFR § 1977.12 (1979), provides in full:

"(a) In addition to protecting employees who file complaints, institute proceedings, or testify in proceedings under or related to the Act, section 11 (c) also protects employees from discrimination occurring because of the exercise 'of any right afforded by this Act.' Certain rights are explicitly provided in the Act; for example, there is a right to participate as a party in enforcement proceedings (sec. 10). Certain other rights exist by necessary implication. For example, employees may request information from the Occupational Safety and Health Administration; such requests would constitute the exercise of a right afforded by the Act. Likewise, employees interviewed by agents of the Secretary in the course of inspections or investigations could not subsequently be discriminated against because of their cooperation.

"(b)(1) On the other hand, review of the Act and examination of the legislative history discloses that, as a general matter, there is no right afforded by the Act which would entitle employees to walk off the job because of potential unsafe conditions at the workplace. Hazardous conditions which may be violative of the Act will ordinarily be corrected by the employer, once brought to his attention. If corrections are not accomplished, or if there is dispute about the existence of a hazard, the employee will normally have opportunity to request inspection of the workplace pursuant to section 8 (f) of the Act, or to seek the assistance of other public agencies which have responsibility in the field of safety and health. Under such circumstances, therefore, an employer would not ordinarily be in violation of section 11 (c) by taking action to discipline an employee for refusing to perform normal job activities because of alleged safety or health hazards.

"(2) However, occasions might arise when an employee is confronted with a choice between not performing assigned tasks or subjecting himself to serious injury or death arising from a hazardous condition at the workplace. If the employee, with no reasonable alternative, refuses in good faith to expose himself to the dangerous condition, he would be protected against subsequent discrimination. The condition causing the employee's apprehension of death or injury must be of such a nature that a reasonable person, under the circumstances then confronting the employee, would conclude that there is a real danger of death or serious injury and that

## I

The petitioner company maintains a manufacturing plant in Marion, Ohio, for the production of household appliances. Overhead conveyors transport appliance components throughout the plant. To protect employees from objects that occasionally fall from these conveyors, the petitioner has installed a horizontal wire-mesh guard screen approximately 20 feet above the plant floor. This mesh screen is welded to angle-iron frames suspended from the building's structural steel skeleton.

Maintenance employees of the petitioner spend several hours each week removing objects from the screen, replacing paper spread on the screen to catch grease drippings from the material on the conveyors, and performing occasional maintenance work on the conveyors themselves. To perform these duties, maintenance employees usually are able to stand on the iron frames, but sometimes find it necessary to step onto the steel mesh screen itself.

In 1973, the company began to install heavier wire in the screen because its safety had been drawn into question. Several employees had fallen partly through the old screen, and on one occasion an employee had fallen completely through to the plant floor below but had survived. A number of maintenance employees had reacted to these incidents by bringing the unsafe screen conditions to the attention of their foremen. The petitioner company's contemporaneous safety instructions admonished employees to step only on the angle-iron frames.

On June 28, 1974, a maintenance employee fell to his death through the guard screen in an area where the newer, stronger

there is insufficient time, due to the urgency of the situation, to eliminate the danger through resort to regular statutory enforcement channels. In addition, in such circumstances, the employee, where possible, must also have sought from his employer, and been unable to obtain, a correction of the dangerous condition."

mesh had not yet been installed.[4] Following this incident, the petitioner effectuated some repairs and issued an order strictly forbidding maintenance employees from stepping on either the screens or the angle-iron supporting structure. An alternative but somewhat more cumbersome and less satisfactory method was developed for removing objects from the screen. This procedure required employees to stand on power-raised mobile platforms and use hooks to recover the material.

On July 7, 1974, two of the petitioner's maintenance employees, Virgil Deemer and Thomas Cornwell, met with the plant maintenance superintendent to voice their concern about the safety of the screen. The superintendent disagreed with their view, but permitted the two men to inspect the screen with their foreman and to point out dangerous areas needing repair. Unsatisfied with the petitioner's response to the results of this inspection, Deemer and Cornwell met on July 9 with the plant safety director. At that meeting, they requested the name, address, and telephone number of a representative of the local office of the Occupational Safety and Health Administration (OSHA). Although the safety director told the men that they "had better stop and think about what [they] were doing," he furnished the men with the information they requested. Later that same day, Deemer contacted an official of the regional OSHA office and discussed the guard screen.[5]

---

[4] As a result of this fatality, the Secretary conducted an investigation that led to the issuance of a citation charging the company with maintaining an unsafe walking and working surface in violation of 29 U. S. C. § 654 (a)(1). The citation required immediate abatement of the hazard and proposed a $600 penalty. Nearly five years following the accident, the Occupational Safety and Health Review Commission affirmed the citation, but decided to permit the petitioner six months in which to correct the unsafe condition. *Whirlpool Corp.,* 1979 CCH OSHD ¶ 23,552. A petition to review that decision is pending in the United States Court of Appeals for the District of Columbia Circuit.

[5] The record does not disclose the substance of this conversation beyond the fact that it concerned the safety of the guard screen.

The next day, Deemer and Cornwell reported for the night shift at 10:45 p. m. Their foreman, after himself walking on some of the angle-iron frames, directed the two men to perform their usual maintenance duties on a section of the old screen.[6] Claiming that the screen was unsafe, they refused to carry out this directive. The foreman then sent them to the personnel office, where they were ordered to punch out without working or being paid for the remaining six hours of the shift.[7] The two men subsequently received written reprimands, which were placed in their employment files.

A little over a month later, the Secretary filed suit in the United States District Court for the Northern District of Ohio, alleging that the petitioner's actions against Deemer and Cornwell constituted discrimination in violation of § 11 (c)(1) of the Act.[8] As relief, the complaint prayed, *inter alia,* that the petitioner be ordered to expunge from its personnel files all references to the reprimands issued to the two employees, and for a permanent injunction requiring the petitioner to compensate the two employees for the six hours of pay they had lost by reason of their disciplinary suspensions.

Following a bench trial, the District Court found that the regulation in question[9] justified Deemer's and Cornwell's refusals to obey their foreman's order on July 10, 1974. The court found that the two employees had "refused to perform the cleaning operation because of a genuine fear of death or serious bodily harm," that the danger presented had been "real and not something which [had] existed only in the minds of the employees," that the employees had acted in good faith,

---

[6] This order appears to have been in direct violation of the outstanding company directive that maintenance work was to be accomplished without stepping on the screen apparatus.

[7] Both employees apparently returned to work the following day without further incident.

[8] See n. 2, *supra.*

[9] See n. 3, *supra.*

and that no reasonable alternative had realistically been open to them other than to refuse to work. The District Court nevertheless denied relief, holding that the Secretary's regulation was inconsistent with the Act and therefore invalid. *Usery* v. *Whirlpool Corp.*, 416 F. Supp. 30, 32–34.

The Court of Appeals for the Sixth Circuit reversed the District Court's judgment. 593 F. 2d 715. Finding ample support in the record for the District Court's factual determination that the actions of Deemer and Cornwell had been justified under the Secretary's regulation, *id.*, at 719, n. 5,[10] the appellate court disagreed with the District Court's conclusion that the regulation is invalid. *Id.*, at 721–736. It accordingly remanded the case to the District Court for further proceedings. *Id.*, at 736. We granted certiorari, 444 U. S. 823, because the decision of the Court of Appeals in this case conflicts with those of two other Courts of Appeals on the important question in issue. See *Marshall* v. *Daniel Construction Co.*, 563 F. 2d 707 (CA5 1977); *Marshall* v. *Certified Welding Corp.*, No. 77–2048 (CA10 Dec. 28, 1978). That question, as stated at the outset of this opinion, is whether the Secretary's regulation authorizing employee "self-help" in some circumstances, 29 CFR § 1977.12 (b)(2) (1979), is permissible under the Act.

## II

The Act itself creates an express mechanism for protecting workers from employment conditions believed to pose an emergent threat of death or serious injury. Upon receipt of an employee inspection request stating reasonable grounds to believe that an imminent danger is present in a workplace,

---

[10] In its petition for certiorari, the petitioner did not cite this aspect of the Court of Appeals' decision as raising a question for review. Accordingly, the issue of whether the regulation covers the particular circumstances of this case is not before the Court. This Court's Rule 23 (1)(c); *General Pictures Co.* v. *Electric Co.*, 304 U. S. 175, 177–179.

OSHA must conduct an inspection. 29 U. S. C. § 657 (f)(1). In the event this inspection reveals workplace conditions or practices that "could reasonably be expected to cause death or serious physical harm immediately or before the imminence of such danger can be eliminated through the enforcement procedures otherwise provided by" the Act,[11] 29 U. S. C. § 662 (a), the OSHA inspector must inform the affected employees and the employer of the danger and notify them that he is recommending to the Secretary that injunctive relief be sought. § 662 (c). At this juncture, the Secretary can petition a federal court to restrain the conditions or practices giving rise to the imminent danger. By means of a temporary restraining order or preliminary injunction, the court may then require the employer to avoid, correct, or remove the danger or to prohibit employees from working in the area. § 662 (a).[12]

To ensure that this process functions effectively, the Act expressly accords to every employee several rights, the exercise of which may not subject him to discharge or discrimination. An employee is given the right to inform OSHA of an imminently dangerous workplace condition or practice and request that OSHA inspect that condition or practice. 29 U. S. C.

---

[11] These usual enforcement procedures involve the issuance of citations and imposition of penalties. When an OSHA inspection reveals a violation of 29 U. S. C. § 654 or of any standard promulgated under the Act, the Secretary may issue a citation for the alleged violation, fix a reasonable time for the dangerous condition's abatement, and propose a penalty. §§ 658 (a), 659 (a), 666. The employer may contest the citation and proposed penalty. §§ 659 (a), (c). Should he do so, the effective date of the abatement order is postponed until the completion of all administrative proceedings initiated in good faith. §§ 659 (b), 666 (d). Such proceedings may include a hearing before an administrative law judge and review by the Occupational Safety and Health Review Commission. §§ 659 (c), 661 (i).

[12] Such an order may continue pending the consummation of the Act's normal enforcement proceedings. § 662 (b).

§ 657 (f)(1).[13] He is given a limited right to assist the OSHA inspector in inspecting the workplace, §§ 657 (a)(2), (e), and (f)(2), and the right to aid a court in determining whether or not a risk of imminent danger in fact exists. See § 660 (c)(1). Finally, an affected employee is given the right to bring an action to compel the Secretary to seek injunctive relief if he believes the Secretary has wrongfully declined to do so. § 662 (d).

In the light of this detailed statutory scheme, the Secretary is obviously correct when he acknowledges in his regulation that, "as a general matter, there is no right afforded by the Act which would entitle employees to walk off the job because of potential unsafe conditions at the workplace." [14] By providing for prompt notice to the employer of an inspector's intention to seek an injunction against an imminently dangerous condition, the legislation obviously contemplates that the employer will normally respond by voluntarily and speedily eliminating the danger. And in the few instances where this does not occur, the legislative provisions authorizing prompt judicial action are designed to give employees full protection in most situations from the risk of injury or death resulting from an imminently dangerous condition at the worksite.

As this case illustrates, however, circumstances may sometimes exist in which the employee justifiably believes that the express statutory arrangement does not sufficiently protect him from death or serious injury. Such circumstances will probably not often occur, but such a situation may arise when (1) the employee is ordered by his employer to work under conditions that the employee reasonably believes pose an imminent risk of death or serious bodily injury, and (2) the employee has reason to believe that there is not sufficient time

---

[13] Should the Secretary determine that "there are no reasonable grounds to believe that a violation or danger exists he shall notify the employe[e] . . . of such determination." § 657 (f)(1).

[14] See n. 3, *supra*.

or opportunity either to seek effective redress from his employer or to apprise OSHA of the danger.

Nothing in the Act suggests that those few employees who have to face this dilemma must rely exclusively on the remedies expressly set forth in the Act at the risk of their own safety. But nothing in the Act explicitly provides otherwise. Against this background of legislative silence, the Secretary has exercised his rulemaking power under 29 U. S. C. § 657 (g)(2) and has determined that, when an employee in good faith finds himself in such a predicament, he may refuse to expose himself to the dangerous condition, without being subjected to "subsequent discrimination" by the employer.

The question before us is whether this interpretative regulation [15] constitutes a permissible gloss on the Act by the Secretary, in light of the Act's language, structure, and legislative history. Our inquiry is informed by an awareness that the regulation is entitled to deference unless it can be said not to be a reasoned and supportable interpretation of the Act. *Skidmore* v. *Swift & Co.,* 323 U. S. 134, 139–140. See *Ford Motor Credit Co.* v. *Milhollin,* 444 U. S. 555; *Mourning* v. *Family Publications Service, Inc.,* 411 U. S. 356.

## A

The regulation clearly conforms to the fundamental objective of the Act—to prevent occupational deaths and serious injuries.[16] The Act, in its preamble, declares that its purpose

---

[15] The petitioner has raised no issue concerning whether or not this regulation was promulgated in accordance with the procedural requirements of the Administrative Procedure Act (APA), 5 U. S. C. § 553. Thus, we accept the Secretary's designation of the regulation as "interpretative," and do not consider whether it qualifies as an "interpretative rule" within the meaning of the APA, 5 U. S. C. § 553 (b)(A).

[16] The Act's legislative history contains numerous references to the Act's preventive purpose and to the tragedy of each individual death or accident. See, *e. g.,* S. Rep. No. 91–1282, p. 2 (1970) (hereinafter S. Rep.), Leg. Hist. 142; 116 Cong. Rec. 37628 (1970), Leg. Hist. 516–517 (Sen. Nelson);

and policy is "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to *preserve* our human resources. . . ." 29 U. S. C. § 651 (b). (Emphasis added.)

To accomplish this basic purpose, the legislation's remedial orientation is prophylactic in nature. See *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n,* 430 U. S. 442, 444–445. The Act does not wait for an employee to die or become injured. It authorizes the promulgation of health and safety standards and the issuance of citations in the hope that these will act to prevent deaths or injuries from ever occurring. It would seem anomalous to construe an Act so directed and constructed as prohibiting an employee, with no other reasonable alternative, the freedom to withdraw from a workplace environment that he reasonably believes is highly dangerous.

Moreover, the Secretary's regulation can be viewed as an appropriate aid to the full effectuation of the Act's "general duty" clause. That clause provides that "[e]ach employer . . .

---

116 Cong. Rec. 37628, 37630 (1970), Leg. Hist. 518, 522 (Sen. Cranston); 116 Cong. Rec. 37630 (1970), Leg. Hist. 522–523 (Sen. Randolph); H. R. Rep. No. 91–1291, pp. 14, 23 (1970) (hereinafter H. R. Rep.), Leg. Hist. 844, 853; 116 Cong. Rec. 38366 (1970), Leg. Hist. 978 (Rep. Young); 116 Cong. Rec. 38367–38368 (1970), Leg. Hist. 981 (Rep. Anderson); 116 Cong. Rec. 38386 (1970), Leg. Hist. 1031, 1032 (Rep. Dent); 116 Cong. Rec. 42203 (1970), Leg. Hist. 1210 (Rep. Daniels). As stated by Senator Yarborough, a sponsor of the Senate bill:

"We are talking about people's lives, not the indifference of some cost accountants. We are talking about assuring the men and women who work in our plants and factories that they will go home after a day's work with their bodies intact." 116 Cong. Rec. 37625 (1970), Leg. Hist. 510.

House and Senate debates are reprinted, along with the House, Senate, and Conference Reports, in a one-volume Committee Print entitled Legislative History of the Occupational Safety and Health Act of 1970, Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 92d Cong., 1st Sess. (June 1971) (cited *supra* and hereafter as Leg. Hist.).

.shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." 29 U. S. C. § 654 (a)(1). As the legislative history of this provision reflects,[17] it was intended itself to deter the occurrence of occupational deaths and serious injuries by placing on employers a mandatory obligation independent of the specific health and safety standards to be promulgated by the Secretary... Since OSHA inspectors cannot be present around the clock in every workplace, the Secretary's regulation ensures that employees will in all circumstances enjoy the rights afforded them by the "general duty" clause.

The regulation thus on its face appears to further the overriding purpose of the Act, and rationally to complement its remedial scheme.[18] In the absence of some contrary indication in the legislative history, the Secretary's regulation must, therefore, be upheld, particularly when it is remembered that safety legislation is to be liberally construed to effectuate the congressional purpose. *United States* v. *Bacto-Unidisk*, 394 U. S. 784, 798; *Lilly* v. *Grand Trunk R. Co.*, 317 U. S. 481, 486.

## B

In urging reversal of the judgment before us, the petitioner relies primarily on two aspects of the Act's legislative history.

---

[17] See S. Rep. 9-10, Leg. Hist. 149-150; H. R. Rep. 21-22, Leg. Hist. 851-852.

[18] It is also worth noting that the Secretary's interpretation of 29 U. S. C. § 660 (c)(1) conforms to the interpretation that Congress clearly wished the courts to give to the parallel antidiscrimination provision of the Federal Mine Safety and Health Act of 1977; 30 U. S. C. § 801 *et seq.* (1976 ed. and Supp. II). The legislative history of that provision, 30 U. S. C. § 815 (c)(1) (1976 ed., Supp. II), establishes that Congress intended it to protect "the refusal to work in conditions which are believed to be unsafe or unhealthful." S. Rep. No. 95-181, p. 35 (1977). See *id.*, at 36; 123 Cong. Rec. 20043-20044 (1977) (remarks of Sen. Church, Sen. Williams, Sen. Javits).

**1**

Representative Daniels of New Jersey sponsored one of several House bills that led ultimately to the passage of the Act.[19] As reported to the House by the Committee on Education and Labor, the Daniels bill contained a section that was soon dubbed the "strike with pay" provision.[20] This section provided that employees could request an examination by

_____

 [19] H. R. 16785, 91st Cong., 2d Sess. (1970), Leg. Hist. 893–976 (bill as reported to the House). See H. R. Rep., Leg. Hist. 831.

 [20] Section 19 (a) (5) of H. R. 16785, *supra*, Leg. Hist. 969–970 (as reported to the House floor) provided in relevant part:

"The Secretary of Health, Education, and Welfare shall publish . . . a list of all known or potentially toxic substances and the concentrations at which such toxicity is known to occur; and shall determine following a request by any employer or authorized representative of any group of employees whether any substance normally found in the working place has potentially toxic or harmful effects in such concentration as used or found; and shall submit such determination both to employers and affected employees as soon as possible. Within sixty days of such determination by the Secretary of Health, Education, and Welfare of potential toxicity of any substance, an employer shall not require any employee to be exposed to such substance designated above in toxic or greater concentrations unless it is accompanied by information, made available to employees, by label or other appropriate means, of the known hazards or toxic or long-term ill effects, the nature of the substance, and the signs, symptoms, emergency treatment and proper conditions and precautions of safe use, and personal protective equipment is supplied which allows established work procedures to be performed with such equipment, or unless such exposed employee may absent himself from such risk of harm for the period necessary to avoid such danger without loss of regular compensation for such period."

The Committee Report explained the provision as follows:

"There is still a real danger that an employee may be economically coerced into self-exposure in order to earn his livelihood, so the bill allows an employee to absent himself from that specific danger for the period of its duration without loss of pay. . . . Nothing herein restricts the right of the employer, except as he is obligated under other agreements, to assign a worker to other non-prohibited work during this time. This should eliminate possible abuse by allowing the employer to avoid payment for work not performed." H. R. Rep. 30, Leg. Hist. 860.

the Department of Health, Education, and Welfare (HEW) of the toxicity of any materials in their workplace. If that examination revealed a workplace substance that had "potentially toxic or harmful effects in such concentration as used or found," the employer was given 60 days to correct the potentially dangerous condition. Following the expiration of that period, the employer could not require that an employee be exposed to toxic concentrations of the substance unless the employee was informed of the hazards and symptoms associated with the substance, the employee was instructed in the proper precautions for dealing with the substance, and the employee was furnished with personal protective equipment. If these conditions were not met, an employee could "absent himself from such risk of harm for the period necessary to avoid such danger without loss of regular compensation for such period."

This provision encountered stiff opposition in the House. Representative Steiger of Wisconsin introduced a substitute bill containing no "strike with pay" provision.[21] In response, Representative Daniels offered a floor amendment that, among other things, deleted his bill's "strike with pay" provision.[22]

---

[21] H. R. 19200, 91st Cong., 2d Sess. (1970), Leg. Hist. 763–830 (bill as originally introduced). See H. Res. 1218, 91st Cong., 2d Sess. (1970), Leg. Hist. 977.

[22] 116 Cong. Rec. 38376, 38377–38378, 38707 (1970), Leg. Hist. 1004, 1005, 1008–1009, 1071 (Rep. Daniels). See 116 Cong. Rec. 38369 (1970), Leg. Hist. 986 (Rep. Perkins). Representative Daniels explained to the House why he was proposing his amendment:

"The provision on employees not losing pay was so generally misunderstood that we have decided to drop it. We have no provision for payment of employees who want to absent themselves from risk of harm; instead, we have this amendment which enables employees subject to a risk of harm to get the Secretary into the situation quickly. Instead of making provisions for employees when their employer is not providing a safe workplace, we have strengthened the enforcement by this amendment provision to try and minimize the amount that employees will be subject to the risk of harm." 116 Cong. Rec. 38377–38378 (1970), Leg. Hist. 1009.

He suggested that employees instead be afforded the right to request an immediate OSHA inspection of the premises, a right which the Steiger bill did not provide. The House ultimately adopted the Steiger bill.[23]

The bill that was reported to and, with a few amendments, passed by the Senate never contained a "strike with pay" provision.[24] It did, however, give employees the means by which they could request immediate Labor Department inspections.[25] These two characteristics of the bill were underscored on the floor of the Senate by Senator Williams, the bill's sponsor.[26]

After passage of the Williams bill by the Senate, it and the Steiger bill were submitted to a Conference Committee. There, the House acceded to the Senate bill's inspection request provisions.[27]

The petitioner reads into this legislative history a congressional intent incompatible with an administrative interpretation of the Act such as is embodied in the regulation at issue in this case. The petitioner argues that Congress' overriding

---

[23] 116 Cong. Rec. 38715 (teller vote), 38723–38724 (rollcall vote) (1970), Leg. Hist. 1091, 1112–1115.

Representative Daniels' proposed amendments were never acted upon. His original bill was voted down in favor of the Steiger bill. See 116 Cong. Rec. 38704–38705 (1970), Leg. Hist. 1064 (the Chairman and Rep. Perkins); 116 Cong. Rec. 38707 (1970), Leg. Hist. 1072 (Rep. O'Hara).

[24] S. 2193, 91st Cong., 2d Sess. (1970), Leg. Hist. 204–295 (bill as reported to Senate by Senate Committee on Labor and Public Welfare). See S. Rep., Leg. Hist. 141.

[25] See S. 2193, *supra*, § 8 (f)(1), Leg. Hist. 252–253.

[26] "[D]espite some wide-spread contentions to the contrary, . . . the committee bill does not contain a so-called strike-with-pay provision. Rather than raising a possibility for endless disputes over whether employees were entitled to walk off the job with full pay, it was decided in committee to enhance the prospects of compliance by the employer through such means as giving the employees the right to request a special Labor Department investigation or inspection." 116 Cong. Rec. 37326 (1970), Leg. Hist. 416.

[27] H. R. Conf. Rep. No. 91–1765, pp. 37–38 (1970), Leg. Hist. 1190–1191. See 29 U. S. C. § 657 (f).

concern in rejecting the "strike with pay" provision was to avoid giving employees a unilateral authority to walk off the job which they might abuse in order to intimidate or harass their employer. Congress deliberately chose instead, the petitioner maintains, to grant employees the power to request immediate administrative inspections of the workplace which could in appropriate cases lead to coercive judicial remedies. As the petitioner views the regulation, therefore, it gives to workers precisely what Congress determined to withhold from them.

We read the legislative history differently. Congress rejected a provision that did not concern itself at all with conditions posing real and immediate threats of death or severe injury. The remedy which the rejected provision furnished employees could have been invoked only after 60 days had passed following HEW's inspection and notification that improperly high levels of toxic substances were present in the workplace. Had that inspection revealed employment conditions posing a threat of imminent and grave harm, the Secretary of Labor would presumably have requested, long before expiration of the 60-day period, a court injunction pursuant to other provisions of the Daniels bill.[28] Consequently, in rejecting the Daniels bill's "strike with pay" provision, Congress was not rejecting a legislative provision dealing with the highly perilous and fast-moving situations covered by the regulation now before us.

It is also important to emphasize that what primarily troubled Congress about the Daniels bill's "strike with pay" provision was its requirement that employees be paid their regular salary after having properly invoked their right to refuse to work under the section.[29] It is instructive that virtually

---

[28] See H. R. 16785, *supra* n. 19, § 12 (b), Leg. Hist. 956 (bill as reported to House).

[29] Congress' concern necessarily was with the provision's compensation requirement. The law then, as it does today, already afforded workers a

every time the issue of an employee's right to absent himself from hazardous work was discussed in the legislative debates, it was in the context of the employee's right to continue to receive his usual compensation.[30]

When it rejected the "strike with pay" concept, therefore, Congress very clearly meant to reject a law unconditionally imposing upon employers an obligation to continue to pay

right, under certain circumstances, to walk off their jobs when faced with hazardous conditions. See 116 Cong. Rec. 42208 (1970), Leg. Hist. 1223–1224 (Rep. Scherle) (reference to Taft-Hartley Act). Under Section 7 of the National Labor Relations Act, 29 U. S. C. § 157, employees have a protected right to strike over safety issues. See *NLRB* v. *Washington Aluminum Co.*, 370 U. S. 9. Similarly, Section 502 of the Labor Management Relations Act, 29 U. S. C. § 143, provides that "the quitting of labor by an employee or employees in good faith because of abnormally dangerous conditions for work at the place of employment of such employee or employees [shall not] be deemed a strike." The effect of this section is to create an exception to a no-strike obligation in a collective-bargaining agreement. *Gateway Coal Co.* v. *Mine Workers,* 414 U. S. 368, 385.

The existence of these statutory rights also makes clear that the Secretary's regulation does not conflict with the general pattern of federal labor legislation in the area of occupational safety and health. See also 29 CFR § 1977.18 (1979).

[30] See 116 Cong. Rec. 37326 (1970), Leg. Hist. 416 (Sen. Williams); 116 Cong. Rec. 38369 (1970), Leg. Hist. 986 (Rep. Perkins); 116 Cong. Rec. 38376, 38377–38378, 38707 (1970), Leg. Hist. 1005, 1009, 1071 (Rep. Daniels); 116 Cong. Rec. 38379 (1970), Leg. Hist. 1011 (Rep. Randall); 116 Cong. Rec. 38391 (1970), Leg. Hist. 1046 (Rep. Feighan); 116 Cong. Rec. 38714 (1970), Leg. Hist. 1089 (Rep. Horton).

The petitioner cites two passages in the legislative debates that, at first blush, appear to suggest that Congress was also concerned with employee walkouts not accompanied by pay. One is a statement by Representative Cohelan, a supporter of the Daniels bill, that "a comprehensive occupational safety and health program . . . must permit the worker to leave his post whenever and wherever conditions exist that endanger his health or safety." 116 Cong. Rec. 38375 (1970), Leg. Hist. 1001. The other is a statement by another Member that the Daniels bill did not authorize "strikes without pay." 116 Cong. Rec. 38708 (1970), Leg. Hist. 1075. Read in context, however, it is clear that both statements were referring to the "strike with pay" provision contained in the Daniels bill.

their employees their regular paychecks when they absented themselves from work for reasons of safety. But the regulation at issue here does not require employers to pay workers who refuse to perform their assigned tasks in the face of imminent danger. It simply provides that in such cases the employer may not "discriminate" against the employees involved. An employer "discriminates" against an employee only when he treats that employee less favorably than he treats others similarly situated.[31]

## 2

The second aspect of the Act's legislative history upon which the petitioner relies is the rejection by Congress of provisions contained in both the Daniels and the Williams bills that would have given Labor Department officials, in imminent-danger situations, the power temporarily to shut down all or part of an employer's plant.[32] These provisions aroused con-

---

[31] Deemer and Cornwell were clearly subjected to "discrimination" when the petitioner placed reprimands in their respective employment files. Whether the two employees were also discriminated against when they were denied pay for the approximately six hours they did not work on July 10, 1974, is a question not now before us. The District Court dismissed the complaint without indicating what relief it thought would have been appropriate had it upheld the Secretary's regulation. The Court of Appeals expressed no view concerning the limits of the relief to which the Secretary might ultimately be entitled. On remand, the District Court will reach this issue.

[32] The version contained in the Daniels bill would have authorized the Secretary to issue a shutdown order of no more than five days' duration. See H. R. 16785, supra n. 19, § 12 (a), Leg. Hist. 955–956 (bill as reported to the House); H. R. Rep. 25, Leg. Hist. 855.

As reported to the Senate, the version contained in the Williams bill limited the permissible duration of the administrative order to 72 hours and required that a Regional Director of the Labor Department concur in the order. S. 2193, supra n. 24, § 11 (b), Leg. Hist. 263–264. See S. Rep. 12–13, Leg. Hist. 152–153; S. Rep. 56–57, Leg. Hist. 195–196 (individual views of Sen. Javits). On the floor of the Senate, amendments were adopted that would have required the Labor Department official

siderable opposition in both Houses of Congress. The hostility engendered in the House of Representatives led Representative Daniels to delete his version of the provision in proposing amendments to his original bill.[33] The Steiger bill that ultimately passed the House gave the Labor Department no such authority.[34] The Williams bill, as approved by the Senate, did contain an administrative shutdown provision, but the Conference Committee rejected this aspect of the Senate bill.[35]

The petitioner infers from these events a congressional will hostile to the regulation in question here. The regulation, the petitioner argues, provides employees with the very authority to shut down an employer's plant that was expressly denied a more expert and objective United States Department of Labor.

As we read the pertinent legislative history, however, the petitioner misconceives the thrust of Congress' concern. Those in Congress who prevented passage of the administra-

---

authorizing the inspector's actions to be an official appointed with the advice and consent of the Senate and that would have mandated that the employer be given prior notice of the reasons for the shutdown. 116 Cong. Rec. 37621–37622 (1970), Leg. Hist. 499–500; 116 Cong. Rec. 37624–37625 (1970), Leg. Hist. 508–509. See S. 2193, *supra* n. 24, § 12 (b), Leg. Hist. 562–563 (bill as passed by Senate).

[33] 116 Cong. Rec. 38372, 38376, 38378, 38707 (1970), Leg. Hist. 993, 1005, 1009–1010, 1011, 1071 (Rep. Daniels). As Representative Daniels explained:

"[B]usiness groups have expressed great fears about the potential for abuse. They believe that the power to shut down a plant should not be vested in an inspector. While there is no documentation for this fear, we recognize that it is very prevalent. The Courts have shown their capacity to respond quickly in emergency situations, and we believe that the availability of temporary restraining orders will be sufficient to deal with emergency situations. Under the Federal rules of civil procedure, these orders can be used *ex parte*. If the Secretary uses the authority that he is given efficiently and expeditiously, he should be able to get a court order within a matter of minutes rather than hours." 116 Cong. Rec. 38378 (1970), Leg. Hist. 1009–1010.

[34] H. R. 19200, *supra* n. 21, § 12, Leg. Hist. 796–798.

[35] H. R. Conf. Rep. No. 91–1765, *supra* n. 27, at 40, Leg. Hist. 1193.

tive shutdown provisions in the Daniels and Williams bills were opposed to the unilateral authority those provisions gave to federal officials, without any judicial safeguards, drastically to impair the operation of an employer's business.[36] Congressional opponents also feared that the provisions might jeopardize the Government's otherwise neutral role in labor-management relations.[37]

Neither of these congressional concerns is implicated by the regulation before us. The regulation accords no authority to Government officials. It simply permits private employees of a private employer to avoid workplace conditions that they believe pose grave dangers to their own safety. The employees have no power under the regulation to order their employer to correct the hazardous condition or to clear the dangerous workplace of others. Moreover, any employee who acts in reliance on the regulation runs the risk of discharge or reprimand in the event a court subsequently finds that he acted unreasonably or in bad faith. The regulation, therefore, does not remotely resemble the legislation that Congress rejected.

---

[36] See 116 Cong. Rec. 35607, 37602 (1970), Leg. Hist. 299, 452–453 (Sen. Saxbe); 116 Cong. Rec. 37338 (1970), Leg. Hist. 425 (Sen. Dominick); 116 Cong. Rec. 37602 (1970), Leg. Hist. 453–454 (Sen. Schweiker); 116 Cong. Rec. 41763 (1970), Leg. Hist. 1149 (Sen. Prouty); H. R. Rep. 55–57, Leg. Hist. 885–887 (minority report); 116 Cong. Rec. 38368 (1970), Leg. Hist. 983 (Rep. Anderson); 116 Cong. Rec. 38372, 38702 (1970), Leg. Hist. 992, 1058 (Rep. Steiger); 116 Cong. Rec. 38378–38379 (1970), Leg. Hist. 1011–1012 (Rep. Randall); 116 Cong. Rec. 38393 (1970), Leg. Hist. 1050 (Rep. Michel); 116 Cong. Rec. 38394 (1970), Leg. Hist. 1052 (Rep. Broomfield); 116 Cong. Rec. 38704 (1970), Leg. Hist. 1062 (Rep. Sikes); 116 Cong. Rec. 38713 (1970), Leg. Hist. 1087 (Rep. Robison); 116 Cong. Rec. 42203 (1970), Leg. Hist. 1210 (Rep. Daniels).

[37] See 116 Cong. Rec. 37346 (1970), Leg. Hist. 448 (Sen. Tower); H. R. Rep. 55–57, Leg. Hist. 885–887 (minority report); 116 Cong. Rec. 38393 (1970), Leg. Hist. 1050 (Rep. Michel). Some of these Members of Congress expressed particular fears over the possible pressures which might be brought to bear on an inspector during a strike.

## C

For these reasons we conclude that 29 CFR § 1977.12 (b)(2) (1979) was promulgated by the Secretary in the valid exercise of his authority under the Act. Accordingly, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*