**ITT GRINNELL CORPORATION,**
Petitioner,

v.

**Raymond J. DONOVAN, Secretary of Labor, United States Department of Labor, Respondent.**

No. 83–3287.

United States Court of Appeals,
Third Circuit.

Argued June 14, 1984.

Decided Sept. 25, 1984.

Edward C. Brewer, III, John P. Campbell (argued), Ford & Harrison, Atlanta, Ga., for petitioner.

Francis X. Lilly, Frank A. White, Dennis K. Kade, Judith N. Macaluso, Andrea C. Casson, Linton W. Hengerer (argued), U.S. Dept. of Labor, Washington, D.C., for respondent.

Before SEITZ, Circuit Judge, STEWART, Associate Justice (Retired),* and ADAMS, Circuit Judge.

---

**OPINION OF THE COURT**

STEWART, Associate Justice (Retired).

The principal question presented in this review is whether the Occupational Safety and Health Review Commission (Commission) may require an employer, as a condition of receiving a modification of the abatement date contained in a citation, to implement a medical surveillance program that is not required by an occupational safety and health standard. The Commission held that it has this authority, and ITT Grinnell Corp. (ITT) petitions for review of that decision.

I

Under the Occupational Safety and Health Act (Act) citations issued by the Secretary of Labor for violations of that statute or its implementing regulations must "fix a reasonable time for the abatement of the violation." 29 U.S.C. § 658. An employer may, of course, contest a citation. 29 U.S.C. § 659(c). In addition, an employer who finds himself unable to abate the violation in a timely fashion may file a petition for modification of the abatement date (PMA), and

> "[u]pon a showing by an employer of a good faith effort to comply with the abatement requirements of a citation, and that abatement has not been completed because of factors beyond his reasonable control, the Secretary, after an opportunity for a hearing as provided in this subsection, shall issue an order affirming or modifying the abatement requirements in such citation." 29 U.S.C. § 659(c).

Despite the statute's reference to a hearing before the Secretary, the Commission has held that the use of that term was inadvertent and that hearings before the Commission were intended. *Secretary of Labor v. H.K. Porter Co., Inc.*, 19773–19745 O.S.H. Dec. ¶ 17,471 (Rev.Comm'n 1974). That holding has not been challenged in this review, and we therefore may, and do, as-

---

* The Honorable Potter Stewart, Associate Justice (retired) of the United States Supreme Court, sitting by designation.

sume that it is correct. With this procedural structure in mind, we turn to the facts of this case.

In 1978, following an inspection of ITT's iron foundry in Columbia, Pennsylvania, the Occupational Safety and Health Administration (OSHA) cited ITT for failing to comply with 29 C.F.R. § 1910.1000(e) (1983). That subsection requires that "administrative or engineering controls must first be determined and implemented whenever feasible" in order to achieve compliance with the maximum permissible levels of employee exposure to various air contaminants specified in § 1910.1000(a)–(d).[1] OSHA's citation of ITT alleged that "[f]easible administrative or engineering controls were not determined and implemented to reduce employee exposure" to silica dust in ITT's cupola and electric foundries, and that ITT employees had been exposed on numerous occasions to silica dust in excess of the amounts permitted by § 1910. The citation required that engineering and administrative controls be implemented to reduce exposure to permissible levels by August 4, 1979.

ITT did not contest the citation, and as a result, the citation became a final order of the Commission. 29 U.S.C. § 659(a). In May of 1979, however, ITT filed a petition for modification of the abatement dates contained in the citation. Specifically, ITT sought a January 1, 1981, abatement date for the electric foundry, and an August 1, 1982, date for the cupola foundry. The Secretary opposed the petition on the ground that ITT's medical surveillance program was inadequate because it did not provide for mandatory pulmonary function tests (PFTs) and chest x-rays for all employees who did not object to the tests. In particular, the Secretary sought to require that ITT offer chest x-rays every three years and PFTs every year until the violation was abated. In the Secretary's view, these tests would aid in the diagnosis of silicosis. ITT contended that the decision whether to offer these tests should be left to the discretion of its plant physician.

A hearing was held before an administrative law judge, who concluded that ITT had not made a good faith effort to abate the violation within the meaning of 29 U.S.C. § 659(c) because it had not implemented any medical surveillance program. Accordingly, the ALJ denied the petition.

A divided Commission reversed, 11 O.S.H.C. 1464 (1983), finding that ITT had implemented a medical surveillance program, although it did not include mandatory x-rays and PFTs. In addition, the Commission held that the parties had stipulated that the only issue was what measures ITT would be required to take in the future, and as a result, the ALJ's finding that ITT had not implemented a medical surveillance program was not relevant to the stipulated issue. The Commission concluded that ITT had acted in good faith and that the parties had stipulated that abatement had not been completed because of factors beyond ITT's reasonable control. Accordingly, the Commission granted the petition. However, it conditioned the extension of the abatement period on ITT's "offering x-rays every three years to each employee exposed to silica dust for at least seven years, unless medically inadvisable, and offering PFTs annually to each employee exposed to silica dust, unless medically inadvisable."[2] ITT subsequently filed a petition for review in this court.

1. Section 1910.1000(e) continues:

"Whenever such controls are not feasible to achieve full compliance, portective equipment or any other protective measures shall be used to keep exposure of employees to air contamniants within the limits prescribed in this section. Any equipment and/or technical measures used for this purpose must be approved for each particular use by a competent industrial hygienist or other technically qualified person.

Whenever respirators are used, their use shall comply with § 1910.134."

2. Commission Chairman Rowland concurred in part and dissented in part. He agreed that ITT's PMA should be granted, but would have held that the Commission lacked the authority to condition the extension of the abatement date on ITT's instituting "interim abatement measures not required by a standard." 11 O.S.H.C., at 1474.

## II

At the outset, we must consider the Secretary's motion to dismiss this case as moot. In the Secretary's view, there is no longer a live controversy between the parties because the abatement periods sought by ITT in the petition at issue in this case have expired. ITT responds that the case is not moot because the Commission intended to require that ITT continue the medical surveillance program until abatement was completed, rather than merely until the expiration of the abatement dates in the petition. ITT further contends that abatement has not yet been completed, and that, as a result, the Commission's order has a continuing effect on it.

 ITT is correct that the Commission intended to require, as a condition of granting the extension in abatement periods, that ITT continue the medical surveillance program until it had abated the silica dust violation. *See* 11 O.S.H.C., at 1471, 1474. We need not, however, decide whether the Commission's imposition of conditions that ran beyond the length of the requested extension in the abatement period is sufficient to save this case from mootness. In our view, even if the extended conditions do not keep the case alive, the dispute in this case is capable of repetition yet evasive of review.

In *Finberg v. Sullivan*, 634 F.2d 50 (3d Cir.1980), this court, sitting en banc, delineated the boundaries of this mootness doctrine:

To avoid mootness on [the ground that a case is capable of repetition yet evasive of review], a complaining party must demonstrate a "reasonable expectation" that he will be subject to a recurrence of the activity that he challenges. He must also show that the activity is "by its very nature" short in duration "so that it could not, or probably would not, be able to be adjudicated while fully 'live.'"

*Id.* at 55, quoting *Weinstein v. Bradford*, 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975) (per curiam) and *Dow Chemical Co. v. EPA*, 605 F.2d 673, 678 n. 12 (3d Cir. 1979) (citations omitted). There is no question that both requirements are satisfied in this case.

Because of ITT's potential liability for penalties for failure to abate the condition for which it was cited, we believe that there is a reasonable likelihood that ITT will file additional petitions for modification of the abatement date. Further, we believe that it is likely that the Secretary will make similar demands to those made in this case and that the Commission's response to those demands will be similar to its response in this case. For these reasons, we conclude that ITT has a "'reasonable expectation' that [it] will be subject to a recurrence of the activity [it] challenges."[3]

ITT is potentially liable for failure-to-abate penalties because the period for abatement contained in the citation has expired and because ITT has not yet abated the conditions for which it was cited.[4] The Secretary may, therefore, initiate failure-to-abate proceedings against it. 29 U.S.C. § 659(b); *see Marshall v. B.W. Harrison Lumber Co.*, 569 F.2d 1303, 1305 (5th Cir. 1978).[5] And under § 666(d), "[a]ny employ-

---

3. Because we conclude that it is reasonably likely that ITT will again be subject to a Commission order requiring medical surveillance, we need not decide whether a reasonable likelihood that the Secretary would seek to impose such conditions would alone be sufficient to save the case from mootness.

4. In response to the Secretary's motion to dismiss, ITT filed an affidavit stating that it had not yet completely abated the violations for which it was cited. At oral argument, counsel for ITT represented that abatement still had not been completed.

5. Under 29 U.S.C. § 659(b), "[i]f the Secretary has reason to believe that an employer has failed to correct a violation for which a citation has been issued within the period provided for its correction (which period shall not begin to run until the entry of a final order by the Commission in the case of any review proceedings under this section initiated by the employer in good faith and not solely for delay or avoidance of penalties), the Secretary shall notify the employer by certified mail of such failure and of the penalty proposed to be assessed under section 666 of this title by reason of such failure, and that the employer has fifteen working days within which to notify the Secretary that

er who fails to correct a violation for which a citation has been issued ... within the period permitted for its correction ... may be assessed a civil penalty of not more than $1,000 for each day during which such failure or violation continues."[6] Since a PMA could provide ITT with significant benefits in the form of protection against failure-to-abate penalties, it is likely that ITT will seek to file an additional petition. Indeed, since the time of the petition at issue in this case, ITT has sought two extensions of the abatement dates beyond those that it requested initially. Further, because the Secretary continues to defend the propriety of, and need for, the medical surveillance program imposed in this case, there is every reason to believe that he would once again seek to impose such a program. Nor is there anything in the Commission's opinion to suggest that it would reach a different result than it did in this case if the Secretary again sought to impose medical surveillance. For these reasons, we believe that ITT has a "reasonable expectation" that it will again be ordered to implement the medical surveillance program to which it so strenuously objects.

In addition, we believe that the nature of a PMA is such that future disputes between the Secretary and ITT about a surveillance program would probably evade review. The fact that the abatement period requested in this case, although characterized as a "lengthy" one by the OSHRC, 11 O.S.H.C., at 1473, expired before the

case could be reviewed by this court, provides evidence that future abatement periods would expire before this court could enter judgment. Further, it is likely that future requests for abatements would be shorter rather than longer than the one in this case since ITT's most recent estimates have predicted compliance within relatively short periods. For example, at oral argument, counsel for ITT represented to the court that ITT expected to achieve total abatement of the cited conditions by the end of the year, and perhaps sooner.[7] It is unlikely that ITT would seek an extension beyond its predicted abatement date. Because the time between the filing of the petition for review in this case and oral argument alone was slightly over a year, we believe that it is highly likely that future controversies would evade review. Cf. Finberg, supra, 634 F.2d at 56 (lawsuit challenging constitutionality of attachment of bank account would take at least a year from the filing of the complaint in the district court to judgment in this court). We therefore conclude that this case is not moot, and proceed to a consideration of the merits of the controversy.

## III

■ ITT's primary contention is that the Commission does not have the authority to make its grant of a PMA conditional on the employer's offering medical tests during the abatement period that are not required by a standard.[8]

---

he wishes to contest the Secretary's notification or the proposed assessment of penalty. If, within fifteen working days from the receipt of notification issued by the Secretary, the employer fails to notify the Secretary that he intends to contest the notification or proposed assessment of penalty, the notification and assessment, as proposed, shall be deemed a final order of the Commission and not subject to review by any court or agency."

6. The complete text of § 666(d) follows:
 "Any employer who fails to correct a violation for which a citation has been issued under section 658(a) of this title within the period permitted for its correction (which period shall not begin to run until the date of the final order of the Commission in the case of any review proceeding under section 659 of this title initiated

by the employer in good faith and not solely for delay or avoidance of penalties), may be assessed a civil penalty of not more than $1,000 for each day during which such failure or violation continues."

7. Similarly, in opposing the Secretary's motion to dismiss as moot, ITT submitted an affidavit that predicted compliance within four months of the date of the affidavit "barring unforeseen difficulties." Affidavit of Wayne D. Murphy, at 3.

8. ITT also makes the related argument that the Secretary does not have the authority to seek to impose such interim measures. However, since the Commission functions strictly as an adjudicative body, Marshall v. Sun Petroleum Products Co., 622 F.2d 1176, 1184 (3d Cir.), cert. denied,

■ In analyzing his question, we must bear in mind that "safety legislation" such as the Occupational Safety and Health Act, "is to be liberally construed to effectuate the congressional purpose." *Whirlpool Corp. v. Marshall,* 445 U.S. 1, 13, 100 S.Ct. 883, 891, 63 L.Ed.2d 154 (1980). With this consideration in mind, we turn to the text of the Occupational Safety and Health Act itself.

■ In our view, the plain language of that statute indicates that the Commission may impose medical surveillance requirements as a condition of granting a PMA. Under § 659(c), when an employer shows that it has made a good faith effort to comply with a citation's abatement requirements, and abatement is not complete "because of factors beyond his reasonable control," the Commission is to issue an order "affirming or *modifying the abatements requirements in such citation.*" Surely, the ordinary meaning of the phrase "modifying … the abatement requirements in such citation" easily encompasses an order that extends the compliance date contained in a citation but makes that extension conditional on the employer's complying with certain new requirements.

Moreover, construing the statute to permit the Commission to impose interim medical surveillance requirements furthers the purpose of the Occupational Safety and Health Act. In its Preamble, the Act states that its purpose and policy is "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources." 29 U.S.C. § 651(b). The congressional goal of protecting the health of workers is plainly advanced by a medical surveillance program, assuming that program is proven to be one that will promote the employees' health.[9]

Despite the force of these considerations, ITT contends that we must reject the Secretary's position because Congress intended the standards-promulgation process to be the exclusive means by which the Secretary might impose medical surveillance requirements on an employer. In ITT's view, only when this process has been followed may the Commission order an employer to implement a medical surveillance program. There is, however, no language in the Act that explicitly restricts the Secretary's or the Commission's authority in that manner, and we are unpersuaded by ITT's contention that these restrictions are implicit in the Act.

ITT first relies on 29 U.S.C. § 655(b)(7). That provision states in pertinent part:

> [W]here appropriate, any [standard promulgated under § 655(b)] shall prescribe the type and frequency of medical examinations or other tests which shall be made available, by the employer or at his cost, to employees exposed to … hazards in order to most effectively determine whether the health of such employees is adversely affected by such exposure.

Although this provision plainly instructs the Secretary to include requirements for medical surveillance in standards "where appropriate," there is nothing in the provision or, insofar as we are aware, in its history that indicates that the Secretary may require an employer to offer medical tests only when he includes them in a standard.

449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980), and since the Secretary will, of course, litigate before the Commission cases in which he objects to the PMA, our conclusion that the Commission has the authority to impose interim measures compels the conclusion that the Secretary has the authority to seek such measures.

We note in this context that neither the Commission nor the Secretary sought to *compel* any employee to undergo any medical test. For that reason, the question whether the Commission and the Secretary would have the authority to do so is not presented in this case.

9. Because our independent analysis of Congress' intent persuades us that the Secretary and the Commission are correct that the Commission has the authority to impose interim conditions, we need not decide what degree of deference we owe to the Secretary and the Commission in this case.

ITT's next argument in support of the claimed exclusivity of the standards-promulgation process is that permitting the Commission and the Secretary to impose a medical surveillance program without a properly promulgated standard sanctions an improper evasion of the standards-promulgation process. ITT notes that this Court has previously emphasized the need for the Secretary to adhere to the procedural requirements contained in the Occupational Safety and Health Act when he promulgates standards. *See, e.g., Marshall v. Pittsburgh-Des Moines Steel Co.,* 584 F.2d 638, 643–44 (3d Cir.1978); *Synthetic Organic Chemical Manufacturers Association v. Brennan,* 506 F.2d 385, 388–390 (3d Cir.1974), *cert. denied,* 423 U.S. 830, 96 S.Ct. 50, 46 L.Ed.2d 48 (1975).

If the Secretary's and the Commission's action in this case had an impact that closely resembled the impact of a standard, then ITT's contentions would have considerable force. We would not be likely to conclude that Congress had devised elaborate procedures for the promulgation of standards, but permitted orders with virtually identical impact to be promulgated without following those procedures. This inference about Congressional intent, of course, has no application to administrative action that is not equivalent to the promulgation of a standard, and the Commission's decision in this case is not at all like a standard. A standard will, of necessity, apply to numerous employers, whereas the Commission's decision applies only to a single employer, during a single time period. Nor is it surprising that the procedures for issuing a decision with limited application, such as the decision in this case, differ from those for promulgating a standard. Because the Commission's order in this case is not simply a disguised standard, we do not believe that the Secretary and the Commission have improperly evaded the standard-promulgation process.[10]

In short, we are unpersuaded by ITT's contention that the standard-promulgation process is intended to be the exclusive means by which the Secretary may impose medical surveillance requirements. Rather, we are convinced that congress intended the Commission to have the power to require an employer to implement such a program as a condition of granting the employer's PMA.

ITT contends, however, that even if the Commission has this authority, the Commission did not properly exercise it in this case. First, ITT argues that it was denied due process because it did not have fair notice that it would be required to offer chest x-rays and pulmonary function tests. To satisfy due process, ITT contends, it should have been apprised of these obligations in either a standard or in a published regulation. In support of this argument, ITT relies on this court's decision in *Dravo Corp. v. OSHRC,* 613 F.2d 1227 (3d Cir. 1980).

■ At issue in the *Dravo* case was the applicability of OSHA's shipbuilding safety standards to a structural fabrication shop. In declining to adopt the broad construction of the regulations urged by the Secretary, this court relied largely on the fact that penal sanctions could be imposed for violation of the standards and the consequent need to apprise an employer of its responsibilities under the law before such sanctions were imposed. The court stated that "an employer should not be subject to penal sanctions for nonadherence to safety standards without adequate notice in the regulations of the exact contours of his responsibility." *Id.,* at 1234. No similar problems of fair notice are involved in this case. The decision of the Commission was prospective only, and that decision gave ITT ample advance warning of its obligations. It informed ITT of what it would be required to do in the future to avoid potential liability for failure-to-abate penalties; it did

---

10. For similar reasons, statements in cases like *Chrysler Corp. v. Brown,* 441 U.S. 281, 301, 312–316, 99 S.Ct. 1705, 1717, 1723–1725, 60 L.Ed.2d 208 (1979), dealing with the procedural require-ments for the issuance of binding agency regulations in contexts other than the Occupational Safety and Health Act are inapposite.

not penalize ITT for past conduct. Thus, the Commission's decision did not impose a penalty on ITT without giving ITT fair notice of what conduct would subject it to penal sanctions and, therefore, did not deprive ITT of due process.[11]

Second, relying on this court's decision in *Marshall v. Sun Petroleum Products Co.*, 622 F.2d 1176 (3d Cir.), *cert. denied*, 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980), ITT contends that the Commission is limited to an adjudicative function under the Act. In addition, ITT notes that the medical surveillance program ordered by the Commission differed from the one proposed by the Secretary: the Secretary sought a requirement that ITT offer chest x-rays every three years to all employees exposed to silica dust, while the Commission ordered x-rays only for those employees exposed to silica dust for more than seven years. ITT concludes that because the program requested differed from the program ordered, the Commission exceeded its authority and undertook a policymaking role.[12]

ITT is correct that in *Sun Petroleum* this court held that "the Review Commission was designed as an independent adjudicator with no rulemaking authority other than for procedural rules for hearings [and] no direct policy role in administering the Act." *Id.*, at 1184. ITT is likewise correct that the Commission did not grant the Secretary all that he sought. We cannot agree with ITT, however, that the Commission exceeded its authority.

■ The Commission stated that "if the Secretary is able to show that the necessity of additional interim protective measures during the extended abatement period, the granting of the PMA should be made conditional on the employer implementing those measures." 11 O.S.H.C., at 1472. Under this test, the Commission will deny any interim protective measures sought by the Secretary that he fails to prove are necessary. Surely a denial of all or part of a requested interim measure based on the Commission's view that the Secretary has not satisfied that burden is quintessentially an adjudicative act. For this reason, we do not believe that the fact that the Commission did not grant the Secretary all of the relief that he originally sought establishes that the Commission exceeded its proper role.

ITT's third contention is that the Commission imposed too lenient a burden of proof on the Secretary by merely requiring him to demonstrate that the requested tests are necessary. ITT argues the Secretary must demonstrate that the tests will not themselves create new hazards for the employees. However, we find no impropriety in the burden imposed by the Commission.

11. ITT's reliance on *Kropp Forge Co. v. Secretary of Labor*, 657 F.2d 119 (7th Cir.1981), in which the Seventh Circuit invalidated a standard on the ground that it was void for vagueness, and on *Diamond Roofing Co. v. OSHRC*, 528 F.2d 645 (5th Cir.1976), in which the court refused to construe broadly the coverage of a safety standard for the same reasons relied on by the *Dravo* court, is similarly misplaced, since these cases involve the need to give fair notice before a penalty for violation of a standard may be imposed.

For similar reasons, we find *Diebold, Inc. v. Marshall*, 585 F.2d 1327 (6th Cir.1978), on which ITT relies, to be inapposite. That case involved, *inter alia*, the issue of what circumstances the prospective portion of a Commission order could be enforced when the portion of that order imposing a penalty had been invalidated on the ground that the underlying regulation failed to give constitutionally adequate notice of its applicability. Since this case does not involve the severability of the prospective and retrospective portions of an order, *Diebold* is plainly inapposite.

12. ITT also appears to argue that the Commission exceeded its authority because the Secretary originally sought a requirement that PFTs and x-rays be offered in all circumstances without regard to a physician's discretion whereas the Commission concluded that the tests should be offered "unless medically inadvisable," 11 O.S.H.C., at 1474. This contention is without merit since the Commission's order that tests should be offered "unless medically inadvisable," appears to be based on its conclusion that the parties had stipulated that the issue in the case was whether the tests "would be offered exposed employees automatically, *unless medically inadvisable*, or ... only at the discretion of the plant's physician." 11 O.S.H.C., at 1467 (emphasis added).

■ The Occupational Safety and Health Act is intended to promote the health of workers. Since a test cannot be considered necessary if its health risks outweigh its benefits, it is readily apparent that the administration of a necessary medical test serves the purpose of the Act. By contrast, because implementation of ITT's proposed burden of proof would prevent the Secretary from seeking tests even where the benefits of the tests clearly outweighs their risks, it does not optimally promote employees' health. We therefore find no error in the Commission's failure to require that the Secretary demonstrate that his testing program would create no health risks.[13]

Finally, ITT argues that the Commission's findings that it is necessary to offer annual pulmonary function tests to all exposed employees, unless medically inadvisable, and that it is also necessary to offer x-rays triennially to all employees exposed for seven years or more, unless medically inadvisable, are not supported by substantial evidence.[14]

The triennial administration of x-rays presents a difficult question. There was a sharp conflict in the testimony about the propriety of a mandatory x-ray program. Dr. Ziem, the Secretary's expert, testified that early diagnosis of silicosis is important in order to prevent disability from the disease. She viewed x-rays as extremely valuable in the early diagnosis of silicosis. She testified that, in most cases, silicosis would manifest itself earlier on either PFTs or x-rays, or both, than it would in either a medical history, symptoms, or a physical examination. In some cases an x-ray will detect silicosis earlier than would a PFT. Dr. Ziem recommended that x-rays be given to all employees exposed to amounts of silica in excess of the Secretary's standard every three years, unless the employee was pregnant or unless the employee's medical history indicated that pregnancy was a possibility. Dr. Ziem recognized that x-rays exposed patients to a small quantity of radiation but thought that the risk of getting cancer from one x-ray was very small and that this risk was outweighed by the potentially large benefits of triennial x-rays. Drs. Siegesmund and Weinberg, ITT's expert and its plant physician, testified that the administration of x-rays should be left to the discretion of the plant physician. They based this conclusion, in part, on the risk that an x-ray could cause cancer and in part on their view that, at least in the early stages of the disease, x-rays were not a valuable tool for diagnosing silicosis.

ITT does not, of course, contend that the mere existence of this conflict in testimony is sufficient to overturn the Commission's decision. Rather, ITT argues that the Commission should not have relied on Dr. Ziem's recommendation of triennial x-rays because in its view that recommendation was based on the assumption that ITT's employees were inhaling silica dust in amounts greater than the standard would permit. ITT contends that the evidence at the hearing established that its employees were wearing respirators and thus were not inhaling silica dust. They note that Dr. Ziem testified that, for exposures to smaller quantities of dust, her recommendation on the frequency of x-rays might be different.

The Secretary responds that because ITT did not contest the original citation, and because this citation detailed numerous instances in which employees were exposed

13. ITT has not argued that there are any requirements other than necessity and absence of risk that the Secretary must demonstrate, and we therefore need not address whether there are any additional requirements.

14. We do not regard the Commission's use of the phrase "unless medically inadvisable" as leaving the decision whether to offer x-rays entirely to the discretion of the plant physician—

the position advocated by ITT and its experts. Rather, the plant physician must base any decision not to offer x-rays on specific reasons why x-rays would be inadvisable in the particular case. He may not base the decision on his view that, in general, x-rays are not useful in diagnosing silicosis, or that, in general, x-rays should not be offered in the absence of other symptoms of silicosis.

to excess dust, ITT may not argue that its employees are not exposed to levels of silica dust in excess of the standard. We disagree.

The issue before the Commission was what measures ITT should take, in the future, to protect its workers. Plainly, current conditions at the plant are relevant to what measures will best protect the employees. Although the citation detailed instances of employee overexposure, we fail to see why a finding of past overexposure should be conclusive of the issue of current exposure when there is record evidence that employees are presently wearing respirators.[15] Accordingly, we cannot agree with the Secretary that ITT may not argue that its employees are not currently exposed to silica dust in excess of the standard.

■ Because the use of respirators reduces the amount of silica dust inhaled by employees, and because Dr. Ziem, the Secretary's own expert, testified that the frequency with which employees should be x-rayed might vary according to the amount of exposure to silica, the use of respirators at ITT should have been considered by the Commission. Since we find no evidence that the Commission considered this issue, we remand to the Commission for consideration of this question.

In our view, although the portion of the Commission's order that requires annual use of PFTs stands on somewhat firmer ground, it suffers from the weaknesses similar to that which we found in the Commission's x-ray order. As a result, although the issue is a close one, we conclude that we must remand this portion of the Commission's order as well.

The testimony clearly established that there were no risks associated with PFTs. In addition, Dr. Siegesmund, ITT's expert, testified that PFTs should be administered to all persons who are or have been exposed to silica dust on a regular basis. As noted above, Dr. Ziem testified that in most

cases silicosis would manifest itself earlier on either PFTs or x-rays, or both, than it would in either a medical history, symptoms, or a physical examination. She recommended PFTs as a vital part of a detection program for employees exposed to amounts of silica in excess of the amount permitted by the Secretary's standard. Given the exposure levels at ITT's plant, she recommended yearly PFTs.

ITT argues that Dr. Ziem's recommendation of yearly PFTs was based on exposure levels at the plant and did not take into account the fact that employees are wearing respirators. It is clear, however, that PFTs are not associated with any health risk and are recommended for employees with any silica dust exposure. The only issue left to consider is the frequency of their administration. Again, it is not entirely clear whether Dr. Ziem, when referring to exposure levels at the plant, *see* tr. 94, took respirators into account. It is clear, however, that the Commission did not consider whether Dr. Ziem's recommendation was based on an erroneous assumption. It is likewise clear that the Commission did not consider whether, assuming that Dr. Ziem's testimony was based on an erroneous assumption, the Secretary's request was supported by Dr. Siegesmund's testimony alone. In our view, these are questions that are best answered by the agency in the first instance, and we therefore remand this issue as well. We note in this context that it may be that, because PFTs do not impose risks on employees, less precise testimony as to the requisite period between administrations should be required. We leave this question as well for the agency on remand.

In sum, we conclude that, upon the Secretary's request, the Commission has the authority to impose conditions on an extended abatement period. However, because the Commission did not consider ITT's current use of respirators during abatement, we remand the case to the Com-

---

**15.** Whether the Commission would be justified in assuming that conditions have not changed since the time of the citation in the absence of evidence to the contrary is a question that is not presented in this case, and we express no opinion on that issue.

mission for reconsideration of its imposition of triennial x-rays and annual PFTs.

*The order of the Occupational Safety and Health Review Commission is vacated. The case is remanded to the Commission for further proceedings consistent with this opinion.*