TERCO, INC.; Sugartree Corporation; and Randal Lawson, Petitioners, Cross–Respondents,

v.

FEDERAL COAL MINE SAFETY AND HEALTH REVIEW COMMISSION; Secretary of Labor, Respondents, Cross–Petitioners.

Nos. 87–3391, 87–3572.

United States Court of Appeals, Sixth Circuit.

Dec. 8, 1987.

Carlos R. Morris (argued), Morris & Morris, Barbourville, Ky., for petitioners, cross-respondents.

L. Joseph Ferrara, Gen. Counsel, Fed. Mine Safety & Health Review Com'n, Washington, D.C., Ann Rosenthal, Vicki J. Shteir–Dunn (argued), Mary Griffen, Office of the Sol., U.S. Dept. of Labor, Arlington, Va., Morton Hollander, Appellate Sec. Civ. Div., U.S. Dept. of Justice, Washington, D.C., for respondents, cross-petitioners.

Before GUY, NELSON, and BOGGS, Circuit Judges.

PER CURIAM.

Petitioner, Terco, Inc., appeals from a final decision of the Federal Mine Safety and Health Review Commission (Commission).[1] The Secretary of Labor has filed a cross-petition seeking enforcement of the Commission's order.

This litigation originally arose under section 105(c) of the Federal Mine Safety and Health Act of 1977 (the Mine Act), 30 U.S.C. § 815(c). The Mine Act was created to provide additional safety and health protection to miners. Section 105(c) is the anti-discrimination provision of the Mine Act and provides in pertinent part:

(1) No person shall discharge or in any manner discriminate against or cause to be discharged or cause discrimination against or otherwise interfere with the exercise of the statutory rights of any miner, representative of miners or applicant for employment in any coal or other mine subject to this chapter because such miner, representative of miners or applicant for employment has filed or made a complaint under or related to this chapter, including a complaint notifying the operator or the operator's agent, or the representative of the miners at the coal or other mine of an alleged danger or safety or health violation in a coal or

1. Although the case style shows Sugartree and Lawson to be petitioners along with Terco, it appears only Terco has perfected a petition.

other mine, or because such miner, representative of miners or applicant for employment is the subject of medical evaluations and potential transfer under a standard published pursuant to section 811 of this title or because such miner, representative of miners or applicant for employment has instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding, or because of the exercise by such miner, representative of miners or applicant for employment on behalf of himself or others of any statutory right afforded by this chapter.

30 U.S.C. § 815(c).

Sugartree Corporation was the subject of a complaint filed with the Secretary of Labor (Secretary) alleging that three miners, James Corbin, Robert Corbin, and A.C. Taylor, had been discharged in retaliation for complaining about excessive dust levels in the Sugartree mine where they worked. Such a retaliatory discharge would have violated section 105(c) of the Mine Act. The Secretary filed a complaint on behalf of all three miners before the Commission. An Administrative Law Judge (ALJ) to whom the case was assigned found that Sugartree had discriminated against the miners. More significantly, for the purposes of this appeal, however, the ALJ also determined that Terco was a successor to Sugartree and was also liable to the miners.[2] Reinstatement and back pay were ordered and a $1,000 civil fine was assessed.

Terco filed a petition for discretionary review with the Commission on the issue of successorship liability only. This petition was granted and, on March 30, 1987, the Commission issued its decision affirming the ALJ and holding Terco to be a successor to Sugartree.[3]

### I.

The only question presented by this appeal is whether substantial evidence supports the Commission's determination that Terco, Inc. is a successor to Sugartree Corporation and, thus, liable to A.C. Taylor for damages. In order to answer this question, it is important to review not only the relationship between Terco and Sugartree but also the relationship among their principals.

In early July, 1984, A.C. Taylor was employed as a timberman at the Sugartree No. 1 mine in Knox County, Kentucky. Sugartree was owned by its president, Randal Lawson. Due to a malfunctioning water spray system, severe dust conditions existed in the mine. After unsuccessfully complaining, several miners, including Taylor and the two Corbins, walked off the job. Randal Lawson was informed by the job foreman that Taylor and the Corbins had been the most vigorous complainers and, the next day, the three were laid off indefinitely, ostensibly due to a decline in production.

At the time of the discriminatory layoff, Sugartree was operated in conjunction with other mining-related entities owned by the Lawson and McCreary families of Barbourville, Kentucky. Sugartree had been incorporated in June of 1983. At the same time, Sadd Coal Company, Inc. (Sadd) and Hubbs Creek Corporation (Hubbs) were also incorporated. Terco was not incorporated until one year later in June of 1984.

Nellie Lawson owned Hubbs and her husband, Randal Lawson, owned Sugartree. Carol McCreary owned Sadd and her husband, Terry McCreary, owned Terco. The offices of these corporations, with the exception of Sadd, were located at the mine site operated by Terco. The Sadd office was located at Nellie Lawson's house. Mrs. Lawson's house was also used for some of Sugartree's business operations.

Although each of the corporations was individually owned, the owners were also involved with all the other corporations. For example, Randal Lawson was president of all the corporations at the time they were founded. He remained president of

---

2. The ALJ also found Randal Lawson, the president of Sugartree, to be jointly and severally liable along with Sugartree and Terco.

3. Prior to the Commission's decision, the two Corbins settled their case and are not further involved.

Sadd and Terco until December, 1984; of Sugartree until late 1984; and of Hubbs until July, 1985. Nellie Lawson, as well as owning Hubbs, was secretary and treasurer of Sugartree at some period of time and performed various secretarial and bookkeeping duties for Sadd and Sugartree. Carol McCreary, the owner of Sadd, was also secretary and treasurer for both Sugartree and Terco and was a full-time paid employee of Hubbs. Terry McCreary, the owner of Terco, was the vice president of Sugartree. He also received salaries from both Sugartree and Sadd, and was on the Board of Directors of Hubbs.

Prior to June of 1983, Terry McCreary had also owned Little Poplar Heavy Equipment Sales and Service, Inc. (Poplar). Randal Lawson also worked at Poplar. Poplar had been operating the No. 1 mine; however, in July of 1983, Sugartree took over the operations. Sugartree operated the No. 1 mine in the same manner and with the same workforce as had Poplar. The workers were not even aware of the change until their July, 1983, pay stubs were received on which Poplar had been crossed out and Sugartree written in.

Randal Lawson's investment in Sugartree consisted of equipment he owned and leases he had for the mine. Sugartree also leased additional equipment from Hubbs. It was an accepted practice for Sugartree also to obtain equipment and parts from Hubbs which was owned by Randal Lawson's wife, Nellie, without making an accounting of it.

When Sugartree initially began operations, it was mining only to the left of the mine entry and was using the continuous mining method. In June of 1984, supervisory personnel at Sugartree began considering mining from the right side of the entry as well, but with a different mining technique (shooting from the solid) which involved the use of explosives to extract the coal.

On September 27, 1984, Randal Lawson, as president of Sugartree, entered into a successor permit assignment agreement with Richland Coal Company whereby Sugartree transferred and assigned its min-

ing permit for Sugartree No. 1 to Richland. The Sugartree production report indicates that coal production at the No. 1 mine ceased in September, 1984. No layoff slips were issued to Sugartree employees. The employees were informed in September, 1984, by Lawson, that Sugartree was out of business.

Also on September 27, 1984, an ALJ had issued orders for the reinstatement of Taylor and the two Corbins. James and Robert Corbin went to the mine to be reinstated the day after they received these orders. At that time, Terry McCreary, through an employee, told the Corbins that Terco was now operating the mine, and that they would have to file applications for employment with Terco in order to return to work. The Corbins filed the applications as they were directed at the office which they had considered to be the office of Sugartree. The Corbins also picked up an application for Taylor; however, they told Taylor it would be useless to hand in the application since it was their impression that Terco would not put any of them back to work. This is what in fact occurred.

In December, 1985, a hearing was held before an ALJ on the complaint of discriminatory discharge of the Corbins and Taylor. The ALJ ruled in favor of the complainants and also ruled that Terco was a successor to Sugartree and found Sugartree, Lawson, and Terco to be jointly and severally liable. The Commission affirmed the ALJ on March 30, 1987.

## II.

In finding Terco to be a successor to Sugartree, both the ALJ and the Commission relied upon the nine-factor successorship test enunciated in *Munsey v. Smitty Baker Coal Company, Inc.*, 2 FMSHRC 3463 (1980), *aff'd in relevant part sub nom. Munsey v. Federal Mine Safety & Health Review Comm'n.*, 701 F.2d 976 (D.C.Cir.), *cert. denied sub nom. Smitty Baker Coal Co. v. Federal Mine Safety and Health Review Comm'n*, 464 U.S. 851, 104 S.Ct. 163, 78 L.Ed.2d 149 (1983). The test set forth in *Munsey* was taken from *EEOC v. MacMillan Bloedel Containers,*

*Inc.*, 503 F.2d 1086 (6th Cir.1974), where this court stated:

> Courts that have considered the successorship question in a labor context have found a multiplicity of factors to be relevant. These include: 1) whether the successor company had notice of the charge, 2) the ability of the predecessor to provide relief, 3) whether there has been a substantial continuity of business operations, 4) whether the new employer uses the same plant, 5) whether he uses the same or substantially the same work force, 6) whether he uses the same or substantially the same supervisory personnel, 7) whether the same jobs exist under substantially the same working conditions, 8) whether he uses the same machinery, equipment and methods of production and 9) whether he produces the same product.

*Id.* at 1094 (citations omitted).

The Commission considered each of the above nine factors and found them all to be satisfied. We agree. Without engaging in a complete review of the evidence as it relates to each of the nine factors, we find the following to be significant as to the relationship between Terco and Sugartree.

First, there was a complete identity of corporate officers and Lawson, as president, was the one responsible for the discharges. Thus, Terco clearly had notice of the nature of the discharges *and* the fact that complaints had been filed.

Second, it is clear that when Sugartree ceased operations and Terco took over, Sugartree was left without assets. It is obvious that Sugartree was left as a hollow shell and had no capacity to provide the relief ordered by the Commission.

Third, there was a substantial and obvious continuity of business operations between Terco and Sugartree. Of the nine *MacMillan Bloedel* factors, the courts are in agreement that this is the most important one. *See Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 751 (7th Cir.1985). In examining the evidence on this issue, the Commission compared the payroll data of the companies and stated that 13 of the 15 employees hired by Terco had been em-

ployed by Sugartree. In addition, the Commission stated that Terco admitted that about 50 percent of its work force had worked for Sugartree, including Sugartree's superintendent and section foreman. Terco began operating the Sugartree mine only one week after Sugartree ceased operations. Although it is true that Terco mined the right side rather than the left and by a different mining technique, changes in these procedures were being considered by Sugartree before it ceased operations. Additionally, the composition of Terco's workforce and the ease with which it began operations, without any significant change other than those that would have taken place even if Sugartree had continued to operate the mine, further demonstrate the continuity of business operations between Sugartree and Terco.

Fourth, the mining jobs under Terco existed under substantially the same conditions as they did at Sugartree. Terco vigorously contends that the mining methods were changed when it took over the No. 1 mine. However, as the Commission and the ALJ pointed out, the same personnel could be employed for either method of mining. The Corbins and Taylor all had experience in the "shooting from the solid" method. In fact, Sugartree had approached each of them prior to their discharges about their experience in the "shooting from the solid" method. The fact that much of Terco's workforce was comprised of former Sugartree employees demonstrates the interchangeability of the positions. Also, Terco continued to use the same equipment and machinery used by Sugartree to the extent possible.

Last, we note that the successor, Terco, certainly produced the identical product as did Sugartree. Coal production was the business of both companies.

Terco also places heavy reliance on the fact that there was no purchase of Sugartree's business by Terco. Although a sale or the lack thereof is certainly one of the factors to which a court can look, it is not in and of itself determinative. In fact, as is the case here, the lack of a sale may actually indicate that the predecessor and succes-

**240**

sor corporations are so closely linked that arms length dealings as usually occur during a sale never occur nor are they necessary.

Finding substantial evidence to support the Commission findings, we AFFIRM and order enforcement of the Commission's orders.