**Elizabeth DOLE, Secretary of Labor, United States Department of Labor, Plaintiff,**

**v.**

**H.M.S. DIRECT MAIL SERVICE, INC., a Corporation, Harb Publications, Ltd., H.M.S. Print–Mail Ltd., and Henry Stepien, Individually and as President. Defendants.**

**No. CIV–88–168S.**

United States District Court, W.D. New York.

Dec. 10, 1990.

**574**

Robert P. Davis, Sol. of Labor, Patricia M. Rodenhausen, Regional Sol., Percy S. Miller, New York City, for plaintiff.

Joel Brownstein, Borins, Setel, Snitzer & Brownstein, Buffalo, N.Y., for defendants.

### DECISION/ORDER

SKRETNY, District Judge.

### INTRODUCTION

The case herein is before this Court for a decision on the merits following a two day bench trial which began on November 13, 1990.

Plaintiff, the Secretary of Labor, United States Department of Labor, brings this action pursuant to § 11(c) of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 660(c) ("OSHA"). Plaintiff alleges that defendant H.M.S. Direct Mail Service, Inc. ("Direct Mail") violated OSHA § 11(c) by suspending and later discharging its employee James Malek ("Malek") because Malek refused, upon orders of a supervisor on two separate occasions, to operate machinery, the operation of which Malek perceived posed a threat of serious injury. Plaintiff has sued H.M.S. Print–Mail, Ltd. ("Print–Mail") and Harb Publications, Ltd. ("Harb") as successor corporations to Direct Mail. Plaintiff also has sued Henry Stepien ("Stepien") as principal shareholder of Direct Mail and Print–

Mail and as principal officer and manager of Direct Mail, Print–Mail and Harb.

Plaintiff seeks the following relief: an injunction prohibiting defendants from further violation of OSHA § 11(c); an order requiring defendants to expunge from all relevant personnel records derogatory references or entries in connection with the discharge of Malek; an order requiring defendants to post notice for sixty (60) consecutive days of this Court's decision; and an order requiring defendants to pay back earnings to Malek plus interest. Plaintiff also seeks costs.

The Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. Plaintiff is the United States Secretary of Labor suing in its official capacity.

2. Since October 1982, and until the present, defendant Stepien has been and remains principal officer and manager of a printing and direct mailing business having its principal place of business located at 2299 Military Road, Tonawanda, New York.

3. In October 1982, the printing and direct mailing business located at 2299 Military Road was Direct Mail, a New York corporation.

4. In 1988, Direct Mail became known as Print–Mail, a New York corporation.

5. Presently, the printing and direct mailing business located at 2299 Military Road is known as Harb, a New York corporation.

6. Direct Mail, Print–Mail and Harb have conducted substantially the same business, using the same premises, machinery and employees.

7. Stepien is principal shareholder of Direct Mail and Print–Mail.

8. Malek commenced employment with Direct Mail in October, 1982. Malek performed various production and service jobs at Direct Mail.

9. One of Malek's duties at Direct Mail was the operation of a paper collating and binding machine known as the Muller–Martini (the "Martini").

10. The Martini contains both a stitching and a cutting mechanism. The cutting mechanism is comprised, in part, of knives.

11. During the course of the Martini's normal operation, from time to time, paper fed into the Martini can "jam" either in the stitching or cutting mechanism. The paper jam must be cleared manually when the Martini's operation has been brought to a halt.

12. The Martini contains a braking mechanism ("the brake") which can be triggered by several safety switches attached to the Martini. When functioning properly, the brake brings the Martini's total operation to a relatively abrupt halt.

13. On the evening of May 9, 1985, Malek's assignment was to operate the Martini. Believing the Martini was not safe to operate because the brake was malfunctioning, Malek telephoned a supervisor, Blanch Cena ("Cena"). Malek told Cena that, due to his safety concerns, he would not operate the Martini. Cena directed Malek to operate the Martini and gave Malek no alternate work assignment. Malek refused to operate the Martini, attached a warning note to the Martini that it was not safe to operate and went home.

14. On the morning of May 10, 1985, Stepien suspended Malek for three days because of Malek's failure to operate the Martini.

15. On May 15, 1985, after serving a three day suspension, Malek returned to work.

16. On May 15, 1985, Cena directed Malek to operate the Martini. After operating the Martini for a short time, Malek believed the Martini unsafe to operate because the brake was malfunctioning and refused to operate the Martini any further. Thereupon, Cena assigned Malek to operate the web press machine ("web press").

17. Later on May 15, 1985, Stepien ordered Malek off the web press and to start operating the Martini. At that time, Malek told Stepien that the Martini was unsafe to operate and asked for an alternate work assignment. Malek continued to refuse to operate the Martini on May 15, 1985.

18. On May 15, 1985, Stepien discharged Malek from Direct Mail for failure to operate the Martini.

## CONCLUSIONS OF LAW

This court has jurisdiction of this lawsuit pursuant to 29 U.S.C. § 660(c)(2).[1] Direct Mail, Print–Mail and Harb are "persons" as defined by 29 U.S.C. § 652(4). As discussed more fully below, Print–Mail and Harb are successor corporations of Direct Mail.

### I. *OSHA § 11(c)*

OSHA § 11(c) renders the discrimination against or discharge of an employee for exercising "any right" protected under OSHA unlawful. 29 U.S.C. § 660(c)(1).

The Secretary of Labor promulgated a regulation, codified at 29 C.F.R. § 1977.12, defining certain "rights" which, although not delineated by § 11(c), are protected under OSHA.

■ One such protected right, codified at 29 C.F.R. § 1977.12(b)(2),[2] is directly at issue in this lawsuit: an employee's right to refuse to work under conditions the employee apprehends will subject him to serious injury or death. By virtue of the regulation, where an employee is confronted

with a choice of not performing an assigned task or performing the task under apprehension of serious injury or death, OSHA § 11(c) protects from subsequent discrimination or discharge the employee who, having no reasonable alternative, refuses to perform the assigned task. The employee's apprehension of serious injury or death is measured by the standard of a reasonable person under the circumstances.[3]

To establish a violation of OSHA § 11(c) the employee's engagement in protected activity need not be the sole reason for the subsequent discharge but "a substantial reason for the action" or if the discharge "would not have taken place 'but for' engagement in protected activity." 29 C.F.R. § 1977.6(b)

Therefore, based on the above discussed statute and regulation, to prevail in this lawsuit plaintiff must prove the following four elements:

A.  When confronted with operating the Martini on May 9 and May 15, 1985, Malek apprehended serious injury or death and there existed insufficient time to eliminate the danger through resort to regular statutory and enforcement channels;

---

1. 29 U.S.C. § 660(c) provides in relevant part:

    (1) No person shall discharge or in any manner discriminate against any employee ... because of the exercise by such employee on behalf of himself or others of any right afforded by this chapter.

    (2) Any employee who believes that he has been discharged or otherwise discriminated against by any person in violation of this subsection may, within thirty days after such violation occurs, file a complaint with the Secretary alleging such discrimination.... If ... the Secretary determines that the provisions of this subsection have been violated, he shall bring an action in any appropriate United States district court against such person.

2. The full text of 29 C.F.R. § 1977.12(b)(2) provides:

    ... occasions might arise when an employee is confronted with a choice between not performing assigned tasks or subjecting himself to serious injury or death arising from a hazardous condition at the workplace. If the employee, with no reasonable alternative, refuses in good faith to expose himself to the

dangerous condition, he would be protected against subsequent discrimination. The condition causing the employee's apprehension of death or injury must be of such a nature that a reasonable person, under the circumstances then confronting the employee, would conclude that there is a real danger of death or serious injury and that there is insufficient time, due to the urgency of the situation, to eliminate the danger through resort to regular statutory enforcement channels. In addition, in such circumstances, the employee, where possible, must also have sought from his employer, and been unable to obtain, a correction of the dangerous condition.
    The United States Supreme Court has upheld this regulation's validity. *Whirlpool Corp. v. Marshall,* 445 U.S. 1, 100 S.Ct. 883, 63 L.Ed.2d 154 (1980).

3. In *Whirlpool,* the Supreme Court characterized this protected right as "the right of an employee to choose not to perform his assigned task because of a reasonable apprehension of death or serious injury coupled with a reasonable belief that no less drastic alternative is available." *Id.,* 445 U.S. at 3–4, 100 S.Ct. at 886.

B. A reasonable person under Malek's circumstances would have apprehended serious injury or death from operation of the Martini;

C. If possible, Malek sought and was unable to obtain a correction of the dangerous situation from his employer; and

D. Malek's refusal to operate the Martini was a substantial reason for his discharge or, but for Malek's refusal to operate the Martini, Malek would not have been discharged.

This Court will address each element *in seriatim*.

A. Malek's Apprehension of Serious Injury

■ The evidence at trial revealed that Malek's refusal to operate the Martini on May 9 and May 15, 1985 stemmed from Malek's legitimate apprehension of serious injury.

Malek testified that on the evening of May 9, 1985, when beginning his routine set-up of the Martini, he noticed the Martini braking improperly, only coasting to a stop. Malek looked into the brake housing and noticed the brake missing. Malek saw the brake on the floor.[4] On May 15, Malek returned to work after a three day suspension. Malek testified that, on May 15, the brake housing was back on the machine but that the Martini still merely coasted to

a stop. Stepien ordered Malek to operate the Martini. When Malek refused to operate the Martini under those circumstances, Stepien discharged Malek.

First, plaintiff presented unrebutted evidence that prior to May 1985, other Direct Mail employees had been injured by the Martini's cutting blades while attempting to clear a paper jam.[5]

Second, plaintiff offered unrebutted and consistent testimony of Malek and Ken Sciarino, another former employee of Direct Mail who operated the Martini, that the Martini malfunctioned just prior to May 9 and May 15, 1985. Both witnesses testified that, about March 1985, due to a malfunction which prevented the Martini from operating at all, an electrician "wired" the Martini enabling temporary operation though rendering all safety mechanisms inoperable. This interim measure was corrected before May 9, 1985.

Furthermore, Malek and Sciarino testified that, in April and May 1985, the Martini's brake housing was "hot" to the touch and smoking.[6] Malek and Sciarino further testified that, as a result of the smoking, the brake was removed entirely from the Martini and taken apart by Dave Turner, a maintenance employee at Direct Mail.[7]

Lastly, Malek and Sciarino testified that in May 1985, the Martini was not stopping properly but only coasted to a stop. This

---

**4.** As discussed below, this testimony is consistent with the testimony of Ken Sciarino, an employee at Direct Mail during the relevant events, who testified that after he saw the brake smoking another Direct Mail employee removed the brake from the Martini for "a couple of days."

Defendants' witnesses claim never having seen the brake on the floor on the evening of May 9, 1985. This is a contradiction in the record. However, it is undisputed that the brake was taken apart at some point near May 9, 1985.

**5.** Malek testified that Steve Cena, while operating the Martini, was cut by its cutting blades, that, in 1984, Malek's mother was injured while attempting to clear a paper jam on the Martini and that, also in 1984, Sharon LaBele cut her hand on the Martini. LaBele, a defense witness in this case, not only failed to rebut this testimony but herself testified that "one little mistake" and one "could lose four fingers."

**6.** Malek and Sciarino testified that they informed supervisors of these observations. As rebuttal, Stepien testified that neither Malek nor Sciarino complained about smoke emanating from the brake housing. This Court discredits Stepien's testimony since Stepien also testified that in 1985, he was largely absent from Direct Mail, and as to Malek, Stepien recalled none of Malek's actions until May 9 and May 15, 1985.

**7.** Malek does not recall the exact date Turner removed the brake from the Martini. Defendants, however, presented testimony that, in response to Malek's complaint and refusal to work on the Martini on May 9, 1985, which led to his suspension on May 10, Turner installed a new brake or brake parts before May 15. Therefore, although the parties dispute when Turner worked on the brake, all parties agree that Turner undertook to repair the brake before May 15, 1985.

testimony remained uncontradicted by defendants.[8]

Therefore, whereas in May 1985, Malek had first hand knowledge not only of past occurrences where a Direct Mail employee had been injured by the cutting blades of the Martini but *also* of the Martini's recent history of malfunctioning, this Court has little doubt that on May 9 and May 15, 1985, Malek apprehended serious injury when confronted with operating the Martini.

Furthermore, this Court concludes that Malek had insufficient time to eliminate the danger through regular enforcement channels.

Indeed, Malek testified that both after he was suspended on May 10, and discharged on May 15, he complained to the OSHA regional office concerning the events now at issue. Once discharged, Malek did file a complaint with OSHA—this complaint immediately led to an on site inspection of Direct Mail and subsequently this lawsuit. Thus, Malek immediately apprised OSHA of the danger. However, obviously resort to OSHA by Malek did not, and surely could not, relieve Malek from the confrontation of having to operate the Martini or face discharge. OSHA § 11(c), as defined by 29 C.F.R. § 1977.12(b)(2), protects the employee faced with the dilemma that Malek faced here.

### B. Malek's Apprehension Was Reasonable Under The Circumstances

As the above discussion suggests, this Court concludes that, on May 9 and May 15, 1985 when confronted with operating the Martini and noticing that the Martini's brake was malfunctioning, especially in light of his awareness of prior malfunctions and employee injuries, Malek's apprehension of serious injury from operating the Martini under those conditions was that of a reasonable man.

Defendants simply failed to rebut plaintiff's evidence that Malek's refusal to operate the Martini on May 9 and May 15 was reasonable under the circumstances.

First, defendants attempted to show that Malek's conduct was unreasonable because the Martini was actually safe to operate on May 9. As evidence that the Martini was safe to operate, defense witnesses Carol Zanghi and Sharon LaBele testified that on May 9, after Malek walked off the job, they, along with Stepien, completed Malek's job. However, the fact that others operated the Martini later on May 9 does not rebut plaintiff's evidence that Malek acted reasonably on May 9. Defendants presented no evidence that Zanghi, LaBele and or Stepien had any occasion to clear a paper jam or even witness the brake function on May 9.[9] Furthermore, finishing the job on May 9 may have been unreasonable had the brake been malfunctioning.[10]

Second, defendants offered evidence that after Malek walked off the job on May 9, Dave Turner, a Direct Mail employee, installed a new brake or brake parts on the Martini before May 15 and, therefore, the Martini was safe to operate on May 15. However, this fact does not sufficiently rebut Malek's testimony that the brake was not functioning properly on May 15. Defendants offered no proof that Turner installed the new brake correctly (Turner did not work for the Martini's manufacturer) or that the new brake or brake parts even functioned properly. Furthermore, this Court is suspect of contradictions by the defense regarding the installation of a new brake; in light of defendants' vigorous con-

---

**8.** As noted above, it is uncontested that the brake, when functioning properly, stops the Martini's operation rather abruptly.

**9.** Furthermore, while Zanghi demonstrated little or no knowledge regarding the braking mechanism, LaBele testified that she knew of no braking mechanism on the Martini. Even Blanche Cena, Malek's supervisor and a veteran of the business, testified that she would not recognize the brake on the Martini.

**10.** On direct, Stepien testified that the May 9 job had to be finished by the morning of May 10 or the contract would be lost, placing the jobs of twelve Direct Mail employees in jeopardy. Clearly, Stepien, who himself helped to finish the May 9 job, could have been more concerned with completing the job than completing the job under proper safety conditions.

tention that the Martini's brake was functioning properly on May 9, it makes little sense for Direct Mail to install a new brake.[11]

Third, as evidence that Malek's apprehension was unreasonable, defendants offered testimony that normally employees used a needle nose pliers to reach into the Martini to clear paper jams. In plaintiff's pretrial statements, plaintiff contends Direct Mail employees cleared paper jams on the Martini by reaching into the Martini with their hands. However, even accepting defendants' evidence that it was customary to use pliers, not one's bare hands, to reach into the Martini to clear a paper jam, defendants offered no evidence that use of the pliers was safe under any circumstance, especially when the brake malfunctions. Furthermore, evidence indicated that even using the pliers could be dangerous; as noted above defense witness LaBele testified that when reaching into the Martini with pliers "one little mistake" and one "could lose four fingers."

Fourth, and finally, defendants presented evidence that on May 16, 1985, one day after Stepien discharged Malek, an OSHA compliance inspector, upon on-site inspection of Direct Mail, did not cite the Martini even though citing other machines for safety violations.[12] However, defendants offered no substantive evidence concerning the inspection[13] although defendants had ample opportunity to call the OSHA compliance inspector as a witness. Therefore, this evidence remains, at best, an unsupported implication by defendants which this Court does not accept.

This case is similar to *Donovan v. Hahner, Foreman & Harness, Inc,* 736 F.2d 1421 (10th Cir.1984), where the Tenth Circuit, *inter alia,* affirmed the district court's finding that an employee was discharged in violation of § 11(c), specifically under 29 C.F.R. § 1977.12(b), where the employee refused to operate certain machinery as ordered by his supervisor.

In *Hahner, Foreman,* the employee experienced previous malfunctioning with the machinery and, since he believed further operation to be a safety threat, the employee informed the supervisor that he would not operate the machinery until inspected. Despite the safety concerns which the employee raised, the supervisor ordered the employee to resume work. The employee refused further work and was discharged.

Affirming the district court's finding that the employee reasonably believed that further operation of the machinery posed an "imminent risk of serious injury," *Id.* at 1428, and noting that much of the district court's findings turned upon the trial judge's determination of the credibility of witnesses, the court of appeals cited the facts that the machinery malfunctioned before the employee walked off the job, and that the supervisor "expected workers to do their assigned tasks despite safety concerns." *Id.* at 1429.

Here, although the evidence implied but did not conclusively establish that Malek's supervisors expected work to be completed despite safety concerns, Malek was clearly aware of prior malfunctions on the Martini and prior injuries suffered by other employees operating the Martini, facts which not only legitimize but amplify Malek's reasonable safety apprehensions.

**C. Malek Sought Correction Of The Situation From His Employer**

This Court is satisfied that Malek was unable to obtain a correction of the danger-

---

11. Stepien testified that a new brake was installed specifically to appease Malek *who had been suspended* on May 9 for refusing to operate the Martini. This Court finds Stepien's testimony rather incredible. Stepien testified adamantly that Malek historically was a disfavored employee who consistently came to work late, was otherwise unreliable and who consumed alcohol during lunchtime. This Court doubts that Direct Mail would repair a properly functioning brake merely to appease Malek.

12. The OSHA inspector came to Direct Mail in response to a complaint filed by Malek. Plaintiff's witness Ken Sciarino corroborated defense testimony that the OSHA representative inspected the Martini.

13. For example, did the inspector witness a demonstration of someone clearing a paper jam to see how the brake functioned under that circumstance?

ous situation from Direct Mail. The evidence remains uncontradicted that Malek notified Cena and Stepien of the fact that the Martini's brake was malfunctioning and that he left a note on the Martini to that effect. Furthermore, it is undisputed and even stipulated that Malek sought an alternate work assignment but nonetheless Stepien ordered Malek to operate the Martini.

### D. Malek Was Discharged For Refusing To Operate The Martini

The evidence conclusively established that had Malek operated the Martini on May 9 and May 15, 1985, Stepien would not have suspended and fired Malek, respectively.

Initially, this Court notes that, in their pretrial submissions and response to plaintiff's First Request for Admissions, defendants have admitted that Malek was discharged upon refusing to operate the Martini. Indeed, defendants separately stipulated to this fact.

However, based solely on the evidence presented at trial, this Court concludes that Stepien suspended and subsequently discharged Malek specifically because Malek refused to operate the Martini.

Evidence adduced at trial showed that Malek was a problem employee whose own conduct, according to defense witnesses, might well have been sufficient cause for suspension or termination.[14] Stepien and Cena testified that Malek had not been fired earlier because of the difficulty of training individuals to operate the Martini.

However, Malek was suspended and soon after discharged immediately upon his refusal to operate the Martini. Furthermore, Stepien testified that he had no recollection of Malek's conduct in 1985 except for Malek's refusal to operate the Martini. This Court is convinced that Malek would not have been suspended and discharged but for his refusal to operate the Martini.

Therefore, this Court finds that Direct Mail violated OSHA § 11(c).

## II. *Successor Corporation Liability*

■ Plaintiff argues that this Court impose liability on Print–Mail and Harb as successor corporations of presently non-existent Direct Mail.

This Court agrees that Print–Mail and Harb are liable as successor corporations for Direct Mail's violation of OSHA § 11(c).[15]

It is undisputed that at all times relevant to the events giving rise to this lawsuit, the business located at 2299 Military Road was Direct Mail [16] and that James Malek was an employee of Direct Mail. It is also undisputed that the printing and direct mailing business presently located at 2299 Military Road is now known as Harb.

When a corporation sells or transfers substantially all its assets to another corporation, where equity dictates, courts have used successor liability as a mechanism to impose liability on the transferee corporation. Although successor liability evolved in the labor context,[17] the theory has recently been applied by federal courts in

---

**14.** Stepien testified that Malek was unreliable, had a poor attendance record, argued with supervisors and consumed alcohol during his lunch breaks. Blanche Cena also testified that Malek was, at times, unreliable.

**15.** This Court is not convinced that Print–Mail remains a viable entity. Therefore, to the extent Print–Mail, like its predecessor Direct Mail, no longer exists, this Court still holds Harb liable for the violations of Direct Mail.

**16.** Based on the evidence presented at trial, this Court cannot determine whether Stepien merely changed the names of the successive corpora-

tions located at 2299 Military Road or whether Stepien undertook three separate incorporation. At this Court's final pretrial conference, defendants said that Direct Mail existed until 1988, at which time the business became Print–Mail. In any event, this Court has no doubt that the business has been substantially the same at least since Malek began employment no matter what its name.

**17.** *See, Terco, Inc v. Fed. Coal Mine Safety & Health Review Commission,* 839 F.2d 236 (6th Cir.1987) (and citations therein), *cert. denied,* 488 U.S. 818, 109 S.Ct. 57, 102 L.Ed.2d 36 (1988).

other contexts.[18]

Courts have generally sanctioned imposition of successor liability where the purchasing or transferee corporation "is merely a continuation of the selling corporation...." *Lumbard v. Maglia, Inc.*, 621 F.Supp. 1529, 1534 (S.D.N.Y.1985); *Long v. A.T. & T. Information Systems, Inc.*, 733 F.Supp. 188, 208 (S.D.N.Y.1990) ("Successorship liability has been described as 'an extra-contractual remedial tool for imposing certain labor obligations on a new employer that has taken over operations of an old employer.'") (citations omitted).

The Southern District has identified relevant factors for this Court to consider in determining whether to impose successor liability:

... whether the successor had prior notice of the claim against the predecessor, the ability of the predecessor to provide relief to the plaintiff, and the continuity of business operations between the predecessor and the successor, which includes such matters as continuity in supervisory personnel, employees, physical plant, location, nature of product or service and methods of producing the product or service.

*Long*, 733 F.Supp. at 208 (citations omitted).

Based on the above factors, this Court has little trouble concluding that Print–Mail and subsequently Harb, as continuing enterprises of Direct Mail, are liable for Direct Mail's violation of OSHA § 11(c). First and foremost, defendants have stipulated that at least since October 1982, when Malek began employment, Direct Mail, Print–Mail and Harb have conducted substantially the same business, using the same premises, machinery and employees. Second, defendant Stepien is or has been the principal officer and manager of all three businesses and has been the principal shareholder of Direct Mail and Print–Mail.

Third, generally the same supervisory personnel have overseen operations at all three businesses.

However, although neither party has briefed this issue, this Court must still consider, even if imposition of successor liability otherwise is appropriate in this case, whether imposition of such liability would be inconsistent with OSHA. *See, Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86 (3rd Cir.1988), *cert. denied*, 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989) (where CERCLA silent on issue of successor liability, court consulted legislative history to ensure imposition of successor liability not inconsistent with scheme of statute).

■ This Court has found nothing in OSHA or its legislative history addressing the imposition of successor liability for OSHA violations. However, in view of OSHA's broad preventative and remedial scheme, as evident from the Act's preamble [19] and which has been duly recognized by the Supreme Court in *Whirlpool*, 445 U.S. at 11–14, 100 S.Ct. at 890–891, this Court concludes that Congress did intend federal courts to impose successor corporation liability where, as here, the violator has sold or transferred its entire operation to another entity which, in essence, merely continues the business using the same premises, machinery, employees and supervisory personnel.

### III. *Measure of Back Wages Owed Malek*

Plaintiff seeks $13,435.25 in back wages for the twenty five month period following Malek's termination, May 1985—June 1987.

■ Plaintiff argues that it was not until twenty five months after Malek's discharge from Direct Mail that Malek began earning from another employer what Malek had been earning from Direct Mail upon dis-

---

18. *See, e.g., Louisiana–Pacific Corp. v. Asarco, Inc.*, 909 F.2d 1260 (9th Cir.1990) (successor liability applied for recovery of costs under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA)).

19. The preamble to OSHA states: "The Congress declares it to be its purpose and policy ... to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources...." 29 U.S.C.A. § 651(b) (West 1985).

charge.[20] Therefore, plaintiff seeks, for the twenty five month period, the difference between income Malek actually received and what Malek would have received had he been employed at Direct Mail for the twenty five months following his discharge.[21] Plaintiff then subtracts income Malek received during this period, including unemployment benefits. This Court agrees, in all respects, with plaintiff's methodology for calculating back wages owed Malek. *See, Brock v. Casey Truck Sales, Inc.,* 839 F.2d 872, 879 (2d Cir.1988). This Court also concludes that plaintiff has met its burden of proving that Malek made reasonable efforts to mitigate the effect of his discharge. *See, e.g., Brock,* 839 F.2d at 879, 880.

■ However, after a careful review of the record, paying particular attention to Malek's testimony and the fact that plaintiff provided the Court virtually no documentary evidence to support plaintiff's claim for back earnings owed Malek, this Court concludes that plaintiff did not meet its burden of proof regarding the amount of back earnings which plaintiff claims defendants owe Malek.

Other than a statement from the New York Department of Labor that Malek received $3,926.00 in unemployment benefits in 1985, which plaintiff correctly set off against its claim for back pay, plaintiff has provided the Court no documentary evidence, such as payroll records from Malek's employers, to support its claim that Malek earned $15,320.00 from his jobs in the twenty-five (25) months proceeding Malek's discharge from Direct Mail. Furthermore, this Court finds Malek's testimony regarding the amount of his earnings after his discharge speculative at best; Malek can provide this Court no income tax returns for the relevant years because, according to his own testimony, he did not file any returns for the years in question, although he did so for other years.

Particularly in light of Malek's imprecise testimony, without documentation supporting the amount plaintiff seeks on Malek's behalf, this Court feels merely accepting Malek's blanket testimony and conclusory statement of loss would work an injustice upon the defendants. Therefore, this Court awards plaintiff $1.00 in back earnings. Additionally, this Court's decision regarding back earnings renders consideration of pre-judgment interest unnecessary.

■ Finally, as a practical matter, since Stepien was principal shareholder of Direct Mail and Print–Mail, and chief manager and officer of Direct Mail, Print–Mail and Harb, and because this Court seeks to ensure that the non-monetary aspects of its judgment are not only implemented but fully complied with, this Court orders that defendant Stepien personally insure full compliance with the non-monetary aspects of this Court's Order. *See, Upjohn Company v. Schwartz,* 246 F.2d 254, 262 (2d Cir.1957) (where individual defendant ceased business under one company name but continued as manager of a successor corporation, court ordered non-monetary injunction against individual defendant personally).

## CONCLUSION

This Court holds that H.M.S. Direct Mail Service, Inc. violated § 11(c) of the Occupational Safety and Health Act of 1970, 29

---

**20.** Malek testified that, although he began looking for a new job soon after discharged from Direct Mail, he did not find a new job, preparing hydraulic jacks, until about January 1986. Unhappy with his earning potential, however, Malek left that job after five months and, until June 1987, worked for various employers at lower wages than he earned for Direct Mail. Finally, in June 1987, Malek landed a job with United Cerebral Palsy which paid him close to his earnings at Direct Mail.

**21.** Plaintiff arrives at this figure in the following manner: according to a statement from the New York Department of Labor's unemployment insurance division, Malek earned $15,687.19 for the one year period immediately preceding his termination. Based on this figure, plaintiff then calculates that, had Malek not been terminated, Malek would have earned $32,681.25 over the next twenty five months at Direct Mail. Plaintiff then subtracts benefits and earnings he received during the twenty five months after his termination ($19,246.00) to arrive at $13,435.25.

U.S.C. § 660(c), by reason of the suspension and termination of James Malek.

## ORDER

HEREBY IT IS ORDERED that,

a) H.M.S. Direct Mail Service, Inc., H.M.S. Print–Mail, Ltd., Harb Publications, Ltd. and any other continuation(s) thereof, are prohibited from violating § 11(c) of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 660(c);

b) FURTHER, that H.M.S. Direct Mail Service, Inc., H.M.S. Print–Mail, Ltd. and Harb Publications, Ltd. shall be jointly and severally liable to the plaintiff for the payment of One Dollar ($1.00);

c) FURTHER, that H.M.S. Direct Mail Service, Inc., H.M.S. Print–Mail, Ltd. and Harb Publications, Ltd. shall be jointly and severally liable to the plaintiff for payment of the costs of bringing this action;

d) FURTHER, that any and all defendants in control of or otherwise in possession of any personnel records pertaining to James Malek shall remove from such records all references relating in any respect to the discharge of James Malek;

e) FURTHER, that each of H.M.S. Direct Mail Service, Inc., H.M.S. Print–Mail, Ltd. and Harb Publications, Ltd., to the extent each maintains an active printing and direct mailing business, shall post a copy of this Court's decision for seventy-five (75) consecutive days following the date of this order in a prominent place where employees have regular access; and

f) FURTHER, this Court holds defendant Henry Stepien, as principal officer and manager of H.M.S. Direct Mail Service, Inc., H.M.S. Print–Mail, Ltd. and Harb Publications, Ltd., personally and individually responsible for the implementation of and continued compliance with paragraphs a, d and e above.

SO ORDERED.